## COCA–COLA CO. v. CLEO SYRUP CORPORATION.

### No. 1630.

District Court, E. D. Missouri, E. D.

Dec. 15, 1942.

568

Fordyce, White, Mayne, Williams & Hartman, of St. Louis, Mo., and Spalding, Sibley, Troutman & Brock, of Atlanta, Ga., for plaintiff.

Ralph E. Kalish and Paul L. Hale, both of St. Louis, Mo., for defendant.

COLLET, District Judge.

The facts in this case are comparatively simple. Plaintiff has for a number of years manufactured and distributed a beverage syrup under the trade-mark "Coca-Cola" and has duly registered that trade-mark in the United States Patent Office. It sells its product throughout the United States and in foreign countries under its trade-mark and has established a secondary meaning for the words "Coca-Cola" that any product sold under that trade-mark is the product which the plaintiff manufactures and sells as Coca-Cola. It is entitled to continue in that business without molestation or interference from the unfair use of colorable imitations of that trade-mark which are designed to or may be likely to lead the public to believe that their products are actually the product of the plaintiff company.

Several years ago, the defendant corporation was organized for the purpose of engaging in the soft drink business. The individual who organized the company and conceived the defendant's original trade-mark testified as a witness in this cause. He states that the accused trade-mark "Cleo-Cola" occurred to him as a result of observing the label upon a cigar which he regularly used and which bore the name Cleopatra with an appropriate accompanying diagram. The trade-mark "Cleo-Cola" which he originally adopted for the defendant company bore the picture of Cleopatra with a green background, comparatively nude figure and the words "Cleo-Cola" appearing in letters definitely different in formation from those used in the plaintiff's trade-mark. The design and appearance of the defendant's original trade-mark label was such that the witness says it was objectionable to persons who frequently organize Sunday School picnics and like entertainments. In order to conform his labels more to the taste of that particular business he stated that he first gave her an attire more suitable for that trade and later eliminated the image of Cleopatra entirely for the same reason. In the first alteration the colors of the background were changed from green and brown to green and red. The lettering of the words "Cleo-Cola" remained in white. When the mark was altered the second time Cleopatra and her verdant background was eliminated entirely and for the first time the form of the letters and the flourishes accompanying them took on a distinctive similarity to the plaintiff's mark. The color of the background was also changed to red and white, conforming to the colors of plaintiff's mark.

The reason for the last stage of the development of the present similarity between the defendant's trade-mark and the plaintiff's is not satisfactorily explained by the defendant. Counsel suggests that all of the developments of the defendant's trade-mark and label have been solely in the interest of improving the appearance thereof. That may have been one of the reasons and certainly the sincerity of counsel is not questioned. But the fact remains that when the next alteration was made in the defendant's trade-mark, there appeared for the first time the form of the letters and the flourishes which are distinctive and most suggestive of the plaintiff's trade-

mark. While it may be that Cleopatra and her background were eliminated for the reasons stated, and while it may be a mere coincidence that the coloring of the trademark and labels in the defendant's last and present design was the same as the plaintiffs, yet the change to the distinctive similarity between the design of the lettering of the last mark adopted by the defendant with the design of the lettering in plaintiff's trade-mark can hardly be assumed to have been accidental.

The sensible, logical conclusion is that the present similarity was premeditated and intentional. Under those circumstances an infringement may be presumed. But in this particular case there is no occasion or necessity for resorting to presumptions. After all of the careful explanation of the various points of similarity and dissimilarity between these trademarks, after all the expert testimony bearing upon the question of whether the plaintiff's trade-mark incorporates only descriptive words and is hence invalid (which latter question has already been adversely determined by the Supreme Court), after viewing the tremendous array of bottled goods labeled under almost every conceivable word which might be applicable to a beverage, except the term "Buffalo Water" referred to in defendant's brief as having been involved in the case of Goode v. United States (United States v. Seven Cases of Buffalo Lithia Water), District of Columbia, 44 App.D.C. 162, the primary question remains—in the judgment of the Court in view of all of this testimony and with the aid of his senses, would the defendant's trade-mark be likely to confuse the average person who uses reasonable and ordinary discrimination, and cause such person to believe that the defendant's trade-mark represents the plaintiff's product? If the answer is in the affirmative, colorable imitation exists. Such is the conclusion in the present case.

The similarity or dissimilarity of a mark in determining the question of colorable imitation is not dependent upon a minute study. It is not dependent upon an exact reproduction of the senior mark. It is not determined by the examination of segregated parts of a mark, nor is it to be determined by the whole of the mark without the accompanying arrangement, color and all other incidentals. It must be determined by an inspection of the whole of the two marks with all of their attributes and the inspection should be made from the viewpoint of the person who occupies the position of the prospective purchaser and not from the viewpoint of the technician and the expert. It may be that when one is told he is to be called as a witness to testify in a cause and for that purpose he or she is asked to examine the two labels and be prepared to answer under oath the question of whether he or she would likely be confused by the similarity of the mark, that such a person in view of the seriousness of the occasion, being duly impressed with the solemnity of the impending oath—possibly never having testified in Court before and assuming that a degree of exactness was required under these circumstances which would not exist if that person was merely the casual purchaser of the product at a picnic or a soda fountain, that even such a layman's testimony, although interested solely as a witness under the circumstances described, would not with complete adequacy suffice to demonstrate the existence or nonexistence of "colorable imitation". Hence, the necessity that the Court also apply its judgment. Frequently, at least, the Court will not view the situation with the eyes of a technician.

It is not for the Court to advise or suggest that if Cleopatra had remained in the picture with her original, verdant background, suitably attired to attend Sunday School picnics—if, in fact, under those conditions she still would have been Cleopatra—and with the words "Cleo-Cola" appearing in the same letters and type originally used and with the retention of the same coloring and arrangement of the entire mark, that no colorable imitation would exist. It is merely for the Court to pass upon conditions as they are presented in praesenti. The answer heretofore indicated is in the humble judgment of this Court the correct one.