LIBERTY MUTUAL INSURANCE COM-
PANY, Plaintiff,

v.

LIBERTY INSURANCE COMPANY OF
TEXAS, Defendant.

No. LR 2903.

United States District Court
E. D. Arkansas, W. D.

July 25, 1960.

Edward L. Wright, Little Rock, Ark., for plaintiff.

A. L. Barber, Little Rock, Ark., for defendant

HENLEY, Chief Judge.

The defendant, Liberty Insurance Company of Texas, is accused of service mark infringement in violation of the Lanham Trade-Mark Act of 1946, 15 U. S.C.A. § 1051 et seq., and of unfair competition. Plaintiff is a Massachusetts corporation authorized to do business in Arkansas. Defendant is a Texas corporation likewise authorized to do business in this State. Jurisdiction is based upon the Lanham Act, supra, and upon diversity of citizenship, the requisite jurisdictional amount being present. The cause has been tried to the Court and has been submitted upon the pleadings, certain stipulations of counsel, a transcript of the testimony taken before the Court, the deposition of S. Bruce Black, numerous exhibits, and written briefs. This memorandum incorporates the Court's findings of fact and conclusions of law as authorized by

Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

Plaintiff was chartered in Massachusetts as a mutual insurance company in 1912 and adopted its present corporate name in 1917. It sells casualty insurance of various types and workmen's compensation insurance. An affiliate, Liberty Mutual Fire Insurance Company, sells fire insurance. Plaintiff's business is conducted in all of the States of the Union and amounts to interstate commerce. Cf. United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440; United States v. New Orleans Insurance Exchange, D.C.La., 148 F.Supp. 915, affirmed per curiam, 355 U.S. 22, 78 S.Ct. 96, 2 L.Ed.2d 66, rehearing denied 355 U.S. 908, 78 S.Ct. 329, 2 L.Ed.2d 262. Plaintiff was admitted to do business in Arkansas in 1923 and has done business here since that time.

Defendant also sells casualty and workmen's compensation insurance and is a competitor of plaintiff. Defendant was incorporated in Texas as a stock company in 1953 as the successor to an unincorporated Lloyd's insurance organization known as "Liberty Lloyd's," and was authorized to do business in Arkansas in September 1954. However, this action was commenced before defendant began actual operations in this State and, pending the outcome of this litigation, defendant has not undertaken to sell any insurance here. It is selling insurance in Texas, and perhaps, to a limited extent, in other States as well.

By virtue of fair dealing, progressive and farsighted business policies and practices, and extensive advertising, plaintiff has become one of the largest writers of casualty and workmen's compensation insurance in the United States. In 1958 plaintiff's total premiums for all lines of insurance amounted to approximately $300,000,000, and during the same year it paid out to or on behalf of its policyholders about $168,000,000. Plaintiff's premiums on insurance written in Arkansas in 1958 amounted to more than $1,000,000, and in that year it paid out to or on behalf of its Arkansas policyholders almost half a million dollars. For the period 1940 to 1958, inclusive, plaintiff's Arkansas premiums exceeded $10,000,000 and during the same period it paid out to or on behalf of its Arkansas policyholders over five and one-half million dollars.

From 1946 through 1958 plaintiff spent over $8,000,000 for advertising, of which sum more than half was spent for advertising in national publications circulating in Arkansas. In 1958 plaintiff's total advertising budget was $963,220, of which $659,895 was spent for advertising in publications circulating in this State.

The unincorporated Lloyd's group to which defendant is the successor was organized in 1938 by the insurance firm of Mitchell, Gartner & Thompson of Fort Worth, Texas. One of the members of that firm, J. Mac Thompson, is now the president and a principal stockholder of the defendant. Defendant's insurance sales in 1958 produced premiums amounting to about $3,600,000 of which more than 90 per cent came from Texas.

Although plaintiff and defendant are competitors, their methods of operation are different. All of defendant's sales are made through local insurance agencies or brokers. Defendant makes no direct solicitations of or direct sales to members of the public desiring insurance and has no advertising program directed at the insurance buying public. It does advertise in trade publications which circulate among insurance agents and brokers and it publishes its annual financial statement in the Fort Worth newspapers. Plaintiff, on the other hand, places no insurance through independent agencies. All of its sales are made by its own employees directly to the public, and plaintiff handles directly all claims arising out of its policies and makes no use of independent adjustment companies. In all of plaintiff's sales promotion and advertising the personal relationship between the policyholders and the company is emphasized.

In addition to selling insurance, investigating claims, defending lawsuits, and paying losses, plaintiff has caused to be carried out extensive research in the field of accident prevention and industrial safety, the results of which are available to its policyholders. Further, plaintiff stands ready to sponsor programs of industrial safety, employee health, and accident prevention in the establishments of holders of its policies of workmen's compensation insurance; and it maintains two vocational rehabilitation centers, the facilities of which are available to injured employees of businesses which carry their workmen's compensation insurance with plaintiff.

In its advertising and otherwise, down through the years, plaintiff has always used an abbreviation of its full corporate name. The original abbreviation used, and which is still extensively employed, is "Liberty Mutual." In recent years plaintiff has begun to refer to itself not only as "Liberty Mutual," but also as "Liberty" or "The Liberty." However, a careful examination of the record before the Court, including plaintiff's exhibits, indicates that plaintiff did not adopt the abbreviation "Liberty" or "The Liberty" until 1955 which was after the commencement of this action.

Since 1921 plaintiff has employed a distinctive service mark in its advertising and on its letterheads, policies and other materials. That mark may be described as a depiction of the upper portion of the Statue of Liberty imposed upon an oblong medallion crossed with narrow horizontal lines. The flame of the torch held by Liberty extends beyond the outer border of the medallion, which border consists of two smooth lines with a narrow space between them.

When the Lanham Act became effective in 1947, plaintiff applied for registration of its mark, and its application was granted in 1949. While the application was pending, it was carefully scrutinized by the Patent Office, and plaintiff was required to make certain changes in the application, which will be noted hereinafter. It seems that the Patent Office refers to plaintiff's mark as the "Torch of Liberty" design, but plaintiff's officers and employees call the mark the "Liberty Lady."

In addition to its service mark, plaintiff employs a distinctive print-type and arrangement of words in setting out its corporate title on the materials upon which such title appears. The words "Liberty Mutual" appear side by side in large type, separated by the service mark which extends above the lettering. Immediately below "Liberty Mutual" appear the words "Insurance Company," printed in much smaller type. Below those words, in still smaller type, appear the words "Home Office: Boston."

As to the defendant, the evidence disclosed that the original name "Liberty Lloyd's" was chosen out of consideration of alliteration and euphony. When the defendant corporation was organized it was decided to retain the word "Liberty" in the title and to call the corporation simply "Liberty Insurance Company." On advice of counsel, however, the words "Of Texas" were added to the proposed name before the articles of incorporation were presented to the Insurance Department of the State of Texas. The purpose of the change was to avoid confusion between the new company and other insurance companies having "Liberty" as a part of their corporate names.

Mr. J. Mac Thompson, heretofore mentioned, testified that at the time defendant corporation was formed, he and his associates were familiar with the plaintiff company, but that they did not copy plaintiff's name, and he insisted that defendant's selection of its name was made in good faith. The Court is not able to find that defendant deliberately copied plaintiff's name, but it is clear that defendant's incorporators were made to realize that the name originally selected by them might cause confusion and, as experienced insurance men, they must have been aware that the plaintiff was at least the principal company with

respect to which confusion might be expected.[1]

Not only is defendant's name somewhat similar to that of plaintiff, but the defendant uses also a service mark, print-type, and word arrangement quite similar to those used by plaintiff. The words "Liberty Insurance" are printed side by side on one line and in very large type, and below them are the words "Company of Texas" in smaller type. Between "Liberty" and "Insurance" appears a depiction of the upper portion of the Statue of Liberty, including upraised arm and burning torch. While defendant's figure is not enclosed by a solid oblong medallion, as is that of plaintiff, the head and arm of defendant's figure are under an arc of seven five-pointed stars, with the torch extending beyond the arc. Two other stars are shown in parallel position on opposite sides of Liberty and somewhat below her shoulders. Defendant's mark, its print-type, and word arrangement appear on defendant's policies, letterheads, and certain other materials disclosed by the evidence. On those items there is also imprinted a distinctive shield referring to the agency of Mitchell, Gartner & Thompson, coupled with a statement that said agency has been in business since 1889.

Thompson further testified that defendant's mark was designed independently by Mr. Gartner when the original Lloyd's organization was formed, and that the design was turned over to a commercial printer for printing. When the defendant corporation was formed, the mark was retained along with the word "Liberty." With regard to the print-type Thompson stated that his company had never been concerned with that, and that it had been worked out by the printer.

As in the case of defendant's name, so in the case of its mark, print-type, and word arrangement, the Court cannot say beyond doubt that there was any deliberate copying by defendant, but the latter's officers must have known that they were employing a format quite similar to that of plaintiff.

Defendant began to expand its activities about 1956, and the evidence discloses that there has been some confusion between the plaintiff and defendant on the part of third parties. Plaintiff has received letters and calls intended for defendant, and the latter has received letters intended for plaintiff. Claims arising in connection with policies issued by defendant have been referred mistakenly to the plaintiff and have been investigated by it until discovery of the error. Holders of policies issued by defendant have communicated with plaintiff relative to claims arising under their policies. On one occasion plaintiff was sued on a workmen's compensation policy issued by defendant. On another occasion an employee of an independent agency handling defendant's insurance inserted plaintiff's name on an insurance policy and mailed the same to plaintiff's office at Forth Worth, Texas, rather than to defendant's office.

Although defendant has sought to minimize and explain those instances of confusion, and while the confusion may have been due in part to carelessness and may not have been quite as serious as plaintiff would have the Court believe, nevertheless the fact remains that confusion in fact has occurred. And that

1. Best's Insurance Guide, 1954 Edition, introduced in evidence by defendant shows only five insurance companies having the word "Liberty" as the first word of their names. Those five include plaintiff and defendant, the Liberty Mutual Fire Insurance Company, and Liberty Lloyds. The other company listed is Liberty National Insurance Company of Coeur d'Alene, Idaho. Likewise listed is Liberty Fire Insurance Underwriters Agency. Best's Insurance News of December 1954 refers to a Liberty Bell Mutual Insurance Company of Philadelphia which had been dissolved in November 1954. An article in the February 20, 1957 issue of "Investor's Reader" deals with the Liberty National Life Insurance Co. of Birmingham, Alabama. The record also contains as an exhibit a newspaper advertisement of the Liberty Life Insurance Company of Greenville, South Carolina, which advertisement was published in March, 1959.

confusion has resulted at least in part from use of the word "Liberty" in defendant's name, accompanied as that use has been by similarity between the service marks, print-types, and word arrangements of the two companies. It is logical to infer that confusion between the two companies will increase as defendant's activities are expanded and extended.

Efforts of defendant to extend its operations beyond Texas have been vigorously but unsuccessfully opposed by plaintiff at the administrative level. Plaintiff has protested to the insurance commissioners of Arkansas, Louisiana, and Oklahoma that defendant's corporate name is deceptively similar to its own and has urged that defendant's applications to do business in those States under its present corporate name be denied, but the applications have been granted. The controversy in Louisiana reached the courts of that State, and it was finally determined that defendant was entitled to do business there. It does not appear, however, that the insurance commissioners of the States that have been mentioned or the Louisiana courts have been confronted with any issue of unfair competition or service mark infringement. Hence, the administrative and judicial determinations favorable to defendant are not controlling here.[2]

It is plaintiff's contention that defendant has infringed and is infringing its registered service mark and that further infringement should be enjoined. Plaintiff contends further that on account of its age, size, business policies and practices, extensive advertising, and good will, the word "Liberty" when used in an insurance context has acquired a "secondary meaning" in Arkansas which identifies plaintiff to the insurance buying public in this State; and that if defendant is permitted to operate in Arkansas under its present name or under any other name incorporating the word "Liberty," the public will be confused, and

such operation will constitute unfair competition and should be enjoined. Plaintiff does not seek to recover damages or accounting for profits.

Defendant denies that plaintiff is entitled to any of the relief sought by it. Defendant challenges the validity of the registration of plaintiff's mark, denies infringement, denies that "Liberty" has acquired any secondary meaning, and denies that it has competed or will compete unfairly with plaintiff. Affirmatively, defendant asserts by way of counterclaim that plaintiff should be enjoined from using its service mark and from filing suits similar to this one in other States where defendant is seeking or may seek to do business.

A "service mark" is a distinctive mark used by a supplier of services to identify his services and to distinguish them from the services of others. A "trade-mark" is a mark used to identify the goods of one person and to distinguish them from the goods of others. 15 U.S.C.A. § 1127.

The power of Congress to legislate with regard to trade and service marks and with regard to unfair competition is not to be found in the constitutional grant of power to provide for patents and copyrights (Const. Art. I, Sec. 8, Clause 8), but rather in the "commerce clause" (Const. Art. I, Sec. 8, Clause 3). In re Trade-Mark Cases, 100 U.S. 82, 25 L.Ed. 550; Ironite Co. v. Guarantee Waterproofing Co., 8 Cir., 64 F.2d 608.

■ While trade-marks were registerable and to some extent protected under the Trade-Mark Acts of 1905 and 1920, service marks were not registerable prior to the effective date of the Lanham Act of 1946. Springfield F. & M. Ins. Co. v. Founders F. & M. Ins. Co., D.C.Cal., 115 F.Supp. 787. The Lanham Act provided for the registration of both types of marks when used in interstate or foreign commerce, and registration and protection of both types are, in gen-

---

2. At an earlier stage of the instant proceedings defendant pleaded that the Louisiana decision above mentioned was res judicata. That plea twice has been rejected by this Court. It is again rejected.

902

eral, governed by the same principles. 15 U.S.C.A. §§ 1051 and 1053.

Section 1052 provides that marks consisting of or comprising certain materials may not be registered. That section further provides, however, that outside of the absolute prohibitions contained therein any mark may be registered which has become "distinctive of the applicant's goods (or services) in commerce," and that the Commissioner of Patents may accept as prima facie evidence that the mark has become distinctive proof of "substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration."

A trade-mark is deemed to be used in interstate commerce when it is placed in any manner on the goods involved, or on their containers or the displays associated therewith, or on the tags or labels affixed thereto, and the goods are sold or transported in interstate commerce. A service mark is deemed to be used in interstate commerce when "it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C.A. § 1127.

■ Registration of a mark is prima facie evidence "of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate, subject to any conditions and limitations stated therein." 15 U.S.C.A. § 1057(b). Otherwise stated, the registration of a mark is presumptively valid. The presumption is that the mark is dissimilar to other registered marks for similar goods or services, that the mark has acquired a secondary meaning, that the mark is owned by the applicant for registration, and that the applicant has the exclusive right to use the mark in interstate commerce in connection with the goods or services specified. Iowa Farmers Union v. Farmers' Educational & Cooperative Union, 8 Cir., 247 F.2d 809; Curtis-Stephens-

Embry Co. v. Pro-Tek-Toe Skate Stop Co., 8 Cir., 199 F.2d 407. The presumption has been referred to as a "strong" one. Maternally Yours, Inc. v. Your Maternity Shop, 2 Cir., 234 F.2d 538, 542.

■ In order for a mark to be entitled to protection under the Act it must be more than merely attractive or ornamental; it must be functional as well. That is to say, it must perform the function of identifying the origin of the goods or services, or of guaranteeing their quality, or it must possess an inherent advertising appeal which serves to create a market for the goods or services involved. Springfield F. & M. Ins. Co. v. Founders F. & M. Ins. Co., supra, 115 F.Supp. at pages 792, 794.

Section 1114(1) provides that any person "who shall, in commerce, (a) use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of any registered mark in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services; or (b) reproduce, counterfeit, copy, or colorably imitate any such mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptables, or advertisements intended to be used upon or in connection with the sale in commerce of such goods or services," shall be liable to a civil action by the registrant for any and all remedies provided by the Act, which remedies include injunctions.

As to injunctions it is provided that they shall be granted "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent Office." 15 U.S.C.A. § 1116.

■ While a mark, to be entitled to the protection of the statute, must be used in interstate commerce, its protection is not limited to acts of infringement which occur in interstate com-

merce. A purely intrastate act of infringement is subject to injunction if it has a substantially adverse effect upon interstate commerce. Iowa Farmers Union v. Farmers' Educational & Cooperative Union, supra, 247 F.2d at pages 815–816, and cases there cited.

Entirely apart from any statute, a manufacturer of goods or a supplier of services may acquire a trade or service mark and prevent its use by others in circumstances amounting to unfair competition. Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195.

In a case of this kind "unfair competition" may be defined, in general, as a course of dealing which leads, or is likely to lead, the public into believing that the goods or services of one supplier are those of another. 87 C.J.S. Trade-Marks, Trade-Names, and Unfair Competition § 13, and cases there cited. While it has been held that a charge of unfair competition cannot be sustained absent proof of subjective fraudulent intent on the part of the defendant, the rule now seems to be that "proof of a fraudulent intent is not required where the necessary and probable tendency of defendant's conduct is to deceive the public, and pass off his goods or business as and for that of plaintiff, especially where only preventive relief against continuance of the wrong is sought or granted." 87 C.J.S., supra, § 93, pages 334–335. And in Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, supra, 305 U.S. at page 325, 59 S.Ct. at page 196, it was said that the facts supporting a suit for infringement of a trade-mark and one for unfair competition are substantially the same.

There are certain names, marks, and symbols which in their primary sense are merely generic or descriptive and do not ordinarily indicate the origin of goods or services. Such names, marks, or symbols, when used in their primary sense, cannot form the subject matter of a trade or service mark. However, a name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods and services may become so associated in the public mind with such goods or services that it serves to identify them and distinguish them from the goods or services of others. When such an association exists, the name, mark, or symbol is said to have acquired a "secondary meaning," in which the original user has a property right which equity will protect against unfair appropriation by a competitor. Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, supra; Katz Drug Co. v. Katz, 8 Cir., 188 F.2d 696; Beneficial Industrial Loan Corporation v. Kline, 8 Cir., 132 F.2d 520; Beneficial Loan Corporation v. Personal Loan & Finance Corporation, D.C.Ark., 100 F.Supp. 838; 87 C.J.S., supra, § 90. A trade-mark or a trade name may have acquired a secondary meaning in one locality but lack such a meaning in another. Schwartz v. Television Center, 89 U.S. App.D.C. 30, 189 F.2d 691; Beneficial Industrial Loan Corporation v. Allenstein, 5 Cir., 173 F.2d 38; Griesedieck Western Brewery Co. v. Peoples Brewing Co., 8 Cir., 149 F.2d 1019. Whether in a given case a name, mark, or symbol has acquired a secondary meaning is a mixed question of law and fact "with the factual aspects predominating." Beneficial Loan Corporation v. Personal Loan & Finance Corporation, supra, 100 F. Supp. at page 846.

To the extent that the rights of the parties to this action may be governed by Arkansas law, it may be said that the Arkansas law of trade-marks, trade names, and unfair competition appears to be orthodox and in accord with the general principles heretofore stated. See Liberty Cash Groceries, Inc. v. Adkins, 190 Ark. 911, 82 S.W.2d 28; Fine v. Lockwood, 179 Ark. 222, 14 S.W.2d 1109; Beneficial Loan Corporation v. Personal Loan & Finance Corporation, supra, 100 F.Supp. at page 845.

### I.

Returning to the facts now in issue, the Court is convinced that there

is no deceptive similarity in the corporate names of the respective parties. When the name "Liberty Mutual Insurance Company" is compared with the name "Liberty Insurance Company of Texas," and when questions of secondary meaning, service marks, print-type, and word arrangement are disregarded, it is clear that the word "Mutual," which is highly significant in the insurance field, and which appears in plaintiff's name but not in that of defendant, and the words "Of Texas" which indicate a Texas corporation, and which appear in defendant's name but not in that of plaintiff, are sufficient marks of distinction to advise any person of ordinary prudence that the two companies are not the same. Nor is there anything in those names which would suggest to such a person any connection between the two companies.

A quite different situation might be presented if defendant had called itself "Liberty Mutual Insurance Company of Texas." The adoption of that name might well have led the public either to disregard entirely the two final modifying words or to come to the erroneous conclusion that defendant was a Texas affiliate or subsidiary of plaintiff. Such, however, is not the case.

### II.

In support of its claim that the word "Liberty" has acquired a secondary meaning in Arkansas, plaintiff relied not only upon its general evidence as to the size, advertising, and good will of the company, but also called certain Arkansas people as witnesses.[3] Those witnesses were Dave Peel, longtime chairman of the Arkansas Workmen's Compensation Commission; Louis Rosen, an insurance agent in Little Rock; J. C. Fuller, an employee of the Coca-Cola Bottling Co. at Little Rock, which company carries insurance with plaintiff,

and who is also one of plaintiff's policyholders; and J. C. Robinson, a lumber dealer in Little Rock, whose company has insurance with plaintiff. The testimony of those witnesses was, in general, that plaintiff has an excellent standing and reputation in Arkansas, and that it is known as "Liberty Mutual" and as "Liberty."

Were the plaintiff contending that the two words "Liberty Mutual," when used in association, have acquired a secondary meaning which identifies plaintiff in this State, the Court would probably agree without hesitation. "Liberty Mutual" is an obvious, and indeed a natural, abbreviation of plaintiff's name. It is pleasing to the ear and easy to remember. It has been used and advertised by plaintiff for many years and is still used and advertised by it.

"Liberty" standing alone, on the other hand, is not a word which immediately or naturally suggests insurance. It is neither an obvious nor a logical abbreviation of plaintiff's name. It is, at best, an artificial and forced abbreviation with respect to which it would take considerable time to educate the public to the extent that it would associate "Liberty" with the plaintiff's business.

According all due weight to the testimony of plaintiff's witnesses, the Court does not feel that plaintiff has discharged the burden that is upon it on the issue now under discussion. As to Mr. Peel, Mr. Fuller, and Mr. Robinson, the Court does not know that any of them was particularly qualified to testify as to the name accorded plaintiff by the insurance buying public in Arkansas, although Mr. Peel may well know what insurance men and lawyers dealing with the workmen's compensation commission call the company. Mr. Fuller testified that he personally referred to plaintiff as "Liberty Mutual," but that he had

3. It has been observed that the question of whether a name which is merely general or descriptive in its primary sense has acquired a "secondary meaning" is a mixed question of law and fact, with the factual aspects predominating, and the burden is upon the plaintiff to establish the secondary meaning claimed by it. Beneficial Loan Corporation v. Personal Loan & Finance Corporation, D.C. Ark., 100 F.Supp. 838.

heard it called "Liberty." He stated further that he heard the name "Liberty Mutual" more often than "Liberty." While Mr. Fuller felt that "Liberty" identified plaintiff "more than anything else," he also testified that he had heard it called "Liberty Mutual."

Mr. Rosen testified that he had been familiar with plaintiff since 1922, that when agents' of stock insurance companies, like himself, referred to plaintiff, they called it "Liberty Mutual," but that agents of mutual companies called it simply "Liberty." The distinction made by Mr. Rosen is not without significance.

None of plaintiff's Arkansas witnesses testified as to how long the public in Arkansas has used "Liberty Mutual" and "Liberty" interchangeably in referring to plaintiff; and, as stated, it does not appear that plaintiff began to use "Liberty," standing alone, in its advertising until after this action was commenced. Even if it be assumed that the insurance buying public in Arkansas now employs both abbreviations in referring to plaintiff, the Court is not convinced that "Liberty" has become so associated with plaintiff in the public mind as to have acquired a secondary meaning, and is still less convinced that it had acquired any such meaning when this suit was filed in 1954.

Since the Court finds that the full corporate names of the parties are not per se deceptively similar, and since plaintiff has failed to establish a secondary meaning for "Liberty," it follows that plaintiff is not entitled to relief on either of those bases standing alone.

### III.

Passing now to the plaintiff's servicemark infringement claim, two questions are presented, namely, was the mark validly registered and, if so, has it been infringed?

In seeking to overcome the presumption of the validity of the mark's registration, defendant contends that plaintiff is not furnishing "services" and is, not entitled to the registration of any service mark; that if plaintiff is render-

ing "services," its mark does not identify those services or distinguish them from like services performed by other insurance companies; that by reason of plaintiff's acquiescence in certain alleged actions of the Patent Office it is estopped from using the mark; and, finally, that the mark contains or consists of material which, in light of the provisions of 15 U.S.C.A. § 1052(a) and (b), renders it ineligible for registration. The Court is not able to agree with any of those contentions.

It is recognized that an insurance policy is not a "service," and it may be conceded that, when an insurance company issues such a policy, it is not, by the act of issuance, performing a service. When an insurance company enters into a contract of insurance evidenced by a written policy, it binds itself, for a consideration, to do certain things in certain contingencies. The primary obligation, of course, is to pay money upon the occurrence of loss—upon the happening of the event insured against. But, the company's obligations may not be limited to its primary obligation to compensate the insured for a loss. The policy may require the company to perform certain services for the insured. A common example of this is the obligation of an automobile liability insurer to defend actions brought against the insured arising out of the latter's operation of his automobile, or to arrange for bail should the insured be arrested following an accident.

In addition, the company may, as a matter of fixed business policy, perform or stand ready to perform for its policyholders services not required by the written contract. And, to the extent that an insurance company binds itself to perform services, or undertakes to perform them for its policyholders, it is engaged in the furnishing of services, and is entitled to the benefits of the Lanham Act.

The Court is convinced that the plaintiff in investigating claims, in negotiating settlements, in defending lawsuits, in making available the results of its re-

search, in maintaining its rehabilitation centers, and in other activities disclosed by the evidence is performing services for its policyholders. Those activities are no less services because in part they may be incidental to plaintiff's performance of its primary contractual obligations or may redound ultimately to plaintiff's own financial benefit. Those services are extensively advertised in interstate commerce, and the mark in question plays a significant part in such advertising.

In support of its contention that plaintiff's mark does not identify its services or distinguish them from the services of others defendant relies heavily on Springfield F. & M. Ins. Co. v. Founders F. & M. Ins. Co., supra. In Springfield the facts were that plaintiff had registered as a service mark a picture of a covered wagon being drawn across the prairie by oxen. Defendant made use of a mark quite similar to that of plaintiff and was sued for infringement. Both companies sold their insurance through brokers exclusively. Neither made any direct sales to the public, and it does not appear that either carried out any particular advertising program in which the covered wagon symbol played a part. The Court found that plaintiff's mark did not identify its insurance services, did not guarantee the contents of plaintiff's policies or the ability of the plaintiff to carry out its contractual obligations, and did not perform "what is probably the most important function of a service-mark, the function of creating a market through its advertising appeal." 115 F.Supp. at page 794. The Court also found that there was no infringement of the mark even if validity of the registration were assumed.

The Springfield decision is doubtless sound in both reasoning and result, but the Court believes that it is readily distinguishable from the instant case. The plaintiff here does not market its policies and services through agencies or brokers. It deals exclusively with the insurance buying public, and for years it

has addressed that public through a well-considered, costly, and extensive program of advertising in which its service mark is employed. The mark as used by plaintiff in much of its advertising is arresting and eye-catching, and the Court finds that the public has come to associate the mark, when used in an insurance context, with the services which plaintiff offers to its policyholders. It thus appears that the mark identifies plaintiff's services and distinguishes them from the services of other insurance companies.

Defendant's claim of estoppel on the part of the plaintiff is stated in the former's brief in the following language:

"Plaintiff is estopped from claiming the right to exclusive use of its service mark * * * on its insurance policies or other literature or advertising relating to the sale thereof, because that right was denied Plaintiff by the U. S. Patent Office, which specifically refused such right in passing on Plaintiff's application to register such service mark, and in registering same on the Principal Register of the U. S. Patent Office, on the ground that 'insurance policies are not deemed services,' as shown by the official file wrapper of the U. S. Patent Office, which ruling of the U. S. Patent Office was accepted by Plaintiff."

The file wrapper discloses that plaintiff's original application was filed on July 5, 1947, the day the Lanham Act became effective. The "Statement" incorporated in the original application was to the effect that plaintiff "has adopted and is using" its service mark "for the sale and advertising of insurance services," and that the mark was being used upon the letterheads, sales and advertising material, insurance policies, and other material of the applicant.

On January 8, 1948, the Examiner directed that the description of services contained in the application be made more definite, and that applicant should cancel the words "the sale and advertising of" and should indicate the types of insurance rendered. In an amended ap-

plication filed in April 1948 plaintiff eliminated the quoted words set forth above and undertook to indicate the types of its insurance services by stating that such services were "of all kinds other than life insurance." The description of services was still deemed indefinite, and on December 6, 1948, a second amended application was filed describing the various lines of insurance sold by plaintiff, but stating that its services were "not limited to" those lines. It is noted that the last type of insurance described, namely "water damage", is followed by the word "policies." The Patent Office objected to the phrase "not limited to" and those words were eliminated in subsequent amended applications.

The final amended application states that plaintiff owns and is using its service mark for "insurance services dealing with accident, liability and property insurance and reinsurance, including the following kinds of insurance: fire and other property insurance, general liability, workmen's compensation, automobile and aircraft damage and liability, disability, fidelity, surety, burglary, forgery and water damage *policies.*" (Emphasis added.) That amended application, as did all its predecessors, contained the further statement that the mark would be used upon "the letterheads, sales and advertising material, *insurance policies* and other material of applicant." (Emphasis added.) That application was granted subject to two corrections made by the Examiner, only one of which appears pertinent here. That correction was the deletion of the word "policies" immediately following the words "water damage." No objection was made to the statement that the mark would be used on insurance policies as well as on other materials. The reason for the deletion of the word "policies" following "water damage" was that " 'policies' are not deemed services."

It is not clear to the Court why the Patent Office in the first instance required the deletion from the original application of the words "the sale and advertising of" preceding the words "insurance services." But, in any event, it does not follow that because those particular words were required to be deleted from the application plaintiff may not employ its mark in connection with its advertising and sale of its services. Indeed, that is the only way in which a service mark can be used. 15 U.S.C.A. § 1127, supra. To deny plaintiff the right to use its mark in connection with the sale and advertising of its services would be tantamount to a denial of the application itself.

The determinations of the Patent Office amounted to no more than a recognition of the statutory distinction between a trade-mark, which identifies tangible goods, and a service mark which identifies services. An insurance policy, considered as a physical object, is not a service, and plaintiff is not protected by the Lanham Act in the use of its mark to identify its policies. But plaintiff not only insures its policyholders against various risks. It also provides them with valuable services. The plaintiff sells and advertises services and this is none the less so merely because members of the public must obtain plaintiff's policies in order to be entitled to the services.

Section 1052 of Title 15 U.S.C.A., upon which defendant relies in part, provides that no mark shall be refused registration on account of its nature unless it:

"(a) Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt or disrepute.

"(b) Consists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof."

Counsel for defendant argues at some length, and not without eloquence, that the Statue of Liberty is either a part of

the "insignia of the United States" within the meaning of subsection (b), supra, or that it is a "national symbol" within the meaning of subsection (a), supra, and that plaintiff's mark disparages the Statue or falsely suggests a connection between plaintiff and the Statue.

█ That the Statue of Liberty is not a part of the "insignia of the United States" is too clear to require discussion. Assuming without deciding that the Statue falls within the statutory concept of a national symbol, considerations of patriotism and of good taste might suggest that there should be no commercialization of the Statue. The Act, however, does not put national symbols on a par with the flag, coat of arms, or other insignia of the United States, which may not in any event be made the subject matter of a trade or service mark. With regard to national symbols the statute provides merely that they shall not be disparaged or held up to contempt or disrepute, and shall not be used as falsely to suggest a connection between the holder of the mark and the symbol. Subject to those limitations it would seem that national symbols may be used for trade or service mark purposes.

█ Here, both plaintiff and defendant are making commercial use of depictions of part of the Statue of Liberty. Both of their depictions of the Statue are dignified, and the business of both parties is a legitimate and dignified business. In such circumstances, the Court cannot find that in the statutory sense plaintiff's mark disparages the Statue, or holds it up to disrepute or contempt. Nor, in the Court's opinion, does the service mark convey to a reasonable and rational mind any idea of any connection between Liberty Mutual Insurance Company on the one hand, and the Statue of Liberty or the United States Government on the other.

█ In sum, on the issue of the validity of the registration the Court finds and concludes that plaintiff's mark identifies plaintiff's services and dis-

tinguishes them from the services of others, that the mark has been used since 1921 in connection with the sale and advertising of insurance services in interstate commerce, that the mark was eligible for registration, that the registration was valid, and that plaintiff is not estopped from using it.

In reaching this conclusion the Court does not overlook the several cases cited by defendant such as Durable Toy & Novelty Co. v. J. Chein & Co., Inc., 2 Cir., 133 F.2d 853, and Springfield F. & M. Ins. Co. v. Founders F. & M. Ins. Co., supra. Those decisions do not militate against the finding that plaintiff's registration is valid.

### IV.

█ As to plaintiff's claim of infringement of its mark, and as to its further claim of unfair competition, apart from technical service mark infringement, the controlling question is whether defendant has created a situation likely to cause confusion—a situation in which it is likely that an appreciable number of buyers of insurance, possessing ordinary prudence and using that degree of care to be expected of such buyers, would confuse defendant's insurance and services with those of plaintiff. Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, supra; National Van Lines v. Dean, 9 Cir., 237 F.2d 688; G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 231 F.2d 316; Squirrel Brand Co. v. Barnard Nut Co., 5 Cir., 224 F.2d 840, certiorari denied 350 U.S. 995, 76 S.Ct. 545, 100 L.Ed. 860; F. W. Fitch Co. v. Camille, Inc., 8 Cir., 106 F.2d 635; Esso, Inc. v. Standard Oil Co., 8 Cir., 98 F.2d 1; Queen Manufacturing Co. v. Isaac Ginsberg & Bros., 8 Cir., 25 F.2d 284; Royal Typewriter Co. v. Cachelin, D.C.N.Y., 127 F. Supp. 173.

In undertaking to answer that question the Court does not look at defendant's corporate name alone, or at its mark alone, or at its lettering and word arrangement alone. Rather, the Court considers defendant's entire format as a unit, as compared with the plaintiff's en-

tire format as a unit. Cf. Coca-Cola Co. v. Cleo Syrup Corp., D.C.Mo., 48 F. Supp. 567, affirmed 8 Cir., 139 F.2d 416, 150 A.L.R. 1056, certiorari denied, 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074.

■ It is obvious that defendant is using a mark quite similar to that of plaintiff in association with a corporate name somewhat similar to plaintiff's name. The defendant's name is printed and arranged in type and in a manner similar to that of plaintiff, with defendant's mark prominently displayed in the same relative position with respect to its name as plaintiff's mark is displayed with respect to its name. The result of defendant's use of its mark in association with its name and its word arrangement and choice of print-type has been to create an overall format which the Court finds to be deceptively similar to that employed by plaintiff, and which has caused confusion in the past and is likely to cause confusion in the future. In the circumstances, defendant's mark is a colorable imitation of the plaintiff's mark and constitutes an infringement thereof.

Moreover, the Court is convinced that defendant in using the mark and in its choice of print-type and word arrangement has been guilty of unfair competition, and plaintiff is entitled to relief on that basis as well as upon the ground of technical service mark infringement.

In answer to plaintiff's claims of infringement and of unfair competition defendant earnestly contends that there is no likelihood of confusion between the two companies because plaintiff's insurance is sold directly to the public, whereas defendant's is placed exclusively by agencies and brokers.

While this difference in marketing method may tend to mitigate confusion, it does not eliminate the likelihood thereof. Reasonably prudent buyers of insurance coming into possession of policies issued by the defendant may well feel that they have acquired plaintiff's policies and are entitled to plaintiff's services and will make no effort to change their coverage. Thus, plaintiff stands to lose business which it would gain otherwise through its advertising, and defendant would retain business which it would otherwise lose. Of particular significance in this connection is plaintiff's evidence to the effect that about 70 per cent of the new business which it writes comes from persons who have previously carried their insurance with other companies.

**V.**

■ As to defendant's counterclaim, little need be said. Since the Court has found plaintiff's service mark to have been registered validly, defendant, of course, is not entitled to have plaintiff enjoined from using the mark. Nor is defendant entitled to have plaintiff enjoined from prosecution of further actions in other jurisdictions based on its claim of secondary meaning for the word "Liberty." That "Liberty" has acquired no secondary meaning in Arkansas does not mean that by this time it may not have obtained such meaning in some other jurisdiction. Beneficial Loan Corporation v. Personal Loan & Finance Corporation, supra.

**VI.**

■ The relief granted herein should be broad enough to protect plaintiff in its use of its registered mark and in its legitimate business and good will, but should not be oppressive or unduly burdensome to the defendant. Cf. King Pharr Canning Operations v. Pharr Canning Enterprises, D.C.Ark., 85 F.Supp. 150.

The defendant should be enjoined from further infringing plaintiff's mark. In addition, and aside from any question of the mark, the Court is of the opinion that defendant should be required to make such alterations in its print-type or word arrangement, or both, as may be necessary to eliminate deceptive similarity to the print-type and word arrangement employed by plaintiff. However, defendant will not be enjoined from using its present corporate name.

**910**

Compliance with the foregoing by the defendant should give sufficient protection to plaintiff and should not be unduly burdensome on defendant. There are other appropriate marks available to defendant and a great variety of print-types from which it may choose. Nor should the arrangement of the words comprising defendant's corporate name create any problem.

Let a decree be entered enjoining defendant to the extent above indicated and dismissing defendant's counterclaim. Costs will be borne by defendant.