Argued and submitted November 21, 1984, affirmed in part; reversed in part and remanded May 22, VDO-Argo's reconsideration, Teleflex's reconsideration and Classic Motor's reconsideration denied August 23, all petitions for review denied October 1, 1985 (300 Or 111)

## CLASSIC INSTRUMENTS, INC.,
*Appellant,*

*v.*

## VDO-ARGO INSTRUMENTS, INC. et al,
*Respondents.*

## (A8111-07222; CA A30774)

700 P2d 677

733-a

733-c

David J. Sweeney, Portland, argued the cause for appellant. With him on the briefs were Mark B. Weintraub, and Gilbertson, Brownstein, Rask, Sweeney, Kerr & Grim, Portland.

Dennis E. Stenzel, Portland, argued the cause for respondent VDO-Argo, Instruments, Inc., With him on the brief was Chernoff, Vilhauer, McClung, Birdwell & Stenzel, Portland.

Robert B. Hopkins, Portland, argued the cause for respondent Teleflex, Inc., a Delaware corporation. With him on the brief were Randall L. Dunn, David N. Gouler, and Copeland, Landye, Bennett and Wolf, Portland.

Arthur L. Whinston, Portland, argued the cause for respondents Classic Motor Carriages, Inc., and Classic Motor Carriages Co., Florida corporations. With him on the brief was Klarquist, Sparkman, Campbell, Leigh & Whinston, Portland.

No appearance by respondent VDO Instruments, Inc.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiff sued defendants for trademark infringement and unfair competition, unlawful trade practices, trademark dilution, interference with a business relationship, breach of contract and breach of fiduciary relationship by conversion of designs and art work. The trial court granted defendants motions for summary judgment, except as to plaintiff's claim against Teleflex for breach of contract. Plaintiff appeals.[1] We affirm in part and reverse in part.

Plaintiff produces and markets automobile gauges to the "replicar" and "street rod" car markets. Hettick, plaintiff's president and owner, began designing automobile gauges in 1975 for a replica of a 1927 Bugatti that he had purchased from defendant Classic Motor Carriages, Inc.'s (CMC) predecessor. In 1977, Hettick solicited CMC to purchase his gauges for its replicars. He showed CMC several gauges that he had produced: speedometer, tachometer, fuel, ammeter, oil pressure, battery volt meter and cylinder head temperature. Hettick drew all the gauge face designs, but he did not manufacture the instrument bases or the bodies for the gauges. A manufacturer supplied the bases, and defendant Teleflex, Inc., supplied tachometers and speedometers. In September, 1977, plaintiff registered an assumed business name with the state of Oregon. In March, 1978, it began shipping gauges to CMC. Shipments continued until April, 1981.

In late 1980, CMC requested that defendant VDO-Argo Instruments (VDO), its former gauge supplier, bid for gauges similar to those then being supplied by plaintiff. VDO made about 1,000 gauges on an order from CMC. The primary

---

[1] In its first, second and third claims, against defendants VDO-Argo Instruments and VDO Instruments (collectively, VDO), Teleflex, Inc. (Teleflex) and Classic Motor Carriages, Inc. and Classic Motor Carriages Leasing Co. (collectively, CMC), plaintiff alleged trademark infringement and unfair competition, unlawful trade practices and trademark dilution. Plaintiff's fourth claim, against VDO and Teleflex, alleged interference with a business relationship. Plaintiff's fifth and sixth claims, against Teleflex, alleged breach of contract and breach of fiduciary relationship. Plaintiff does not appeal the entry of summary judgment for defendants on its claims for unlawful trade practices or trademark dilution.

The trial court found that there was no just reason for delay and that judgment should be entered disposing of all claims, except the breach of contract claim against Teleflex. ORCP 67B. GGL Industries was voluntarily dismissed from the case. However, the record does not contain a final judgment as to that defendant.

differences in appearance between plaintiff's and VDO's gauges were the "Classic" and "VDO" logos on the face of VDO's gauges, rather than plaintiff's "Classic Instruments" logo. CMC later decided that the VDO gauges were unacceptable, and it purchased none. VDO independently marketed about 500 of its gauges.

In 1981, CMC requested that Teleflex manufacture gauges. In July, 1981, Teleflex began shipping gauges to CMC. Teleflex's gauges were similar in appearance to plaintiff's, except that the "Classic" logo appeared on the face of the Teleflex gauges and the Teleflex logo, a stylized "T," appeared on their backside.

Plaintiff publicized its gauges by advertising in magazines that cater to the replicar, street rod and specialty automotive markets. It also had booths at trade shows in various cities. After it terminated its relationship with plaintiff, CMC continued to use plaintiff's gauges in its replicar shows and displays nationwide, and it continued to display plaintiff's gauges in its catalogue.

■ Plaintiff's several assignments of error present essentially the same legal issue: whether plaintiff presented genuine issues of material fact precluding the granting of defendants' summary judgment motions. ORCP 47. We view the record in the light most favorable to plaintiff, the party opposing the motions, and draw all reasonable inferences from the affidavits and depositions against defendants, the moving parties, even as to those issues as to which plaintiff would have the burden of proof at trial. *Seeborg v. General Motors Corporation,* 284 Or 695, 699, 588 P2d 1100 (1978); *Uihlein v. Albertson's Inc.,* 282 Or 631, 634, 580 P2d 1014 (1978).

Plaintiff's first assignment of error involves its claims for trademark infringement and unfair competition against all defendants. All defendants are alleged to have directly infringed plaintiff's trademark. As to plaintiff's claim for "intentionally passing off," CMC is alleged to have acted directly, VDO and Teleflex are alleged to have acted contributorily.[2] Plaintiff's second assignment of error involves its

---

[2] While plaintiff's trademark infringement allegations blur the distinctions between these claims, it is apparent that the parties understand that there were separate allegations.

claim for interference with a business relationship against VDO and Teleflex. Plaintiff's third assignment of error involves its claim for breach of fiduciary relationship against Teleflex.

## I. UNFAIR COMPETITION; FEDERAL AND STATE TRADEMARK LAW

Plaintiff's first assignment of error raises the questions (1) whether a genuine issue of material fact exists that there is a protectible interest under federal or state law in the name "Classic Instruments," (2) whether plaintiff's claim for a protectible interest in its gauge designs under state common law is preempted by federal law, (3) whether plaintiff raised a genuine issue of material fact that defendants had "passed off" their gauges as plaintiff's gauges, and (4) whether a genuine issue of material fact exists that there is a protectible interest under federal law in the overall design of plaintiff's gauges.[3]

 The law of trademarks is a species of the genus "unfair competition." *Milgrim Bros. v. Schlesinger,* 168 Or 476, 482, 123 P2d 196 (1942); McCarthy, *Trademarks and Unfair Competition,* § 2:2 (2d ed 1984)(hereinafter, McCarthy, *Trademarks).* In Oregon, common law trademark cases typically have involved the alleged invasion of a protectible interest in a tradename. *See e.g., Frostig v. Saga Enterprises, Inc.,* 272 Or 565, 539 P2d 154 (1975); *Lift Truck v. Bourne,* 235 Or 446, 385 P2d 735 (1963); *Western Bank v. Western Bancorp.,* 47 Or App 191, 617 P2d 258 (1980).[4] Trademarks and tradenames are protectible under common law on the same principles. McCarthy, *Trademarks, supra,* at § 4:4. In an action for trademark infringement, the question is whether customers or users of goods or services are likely to be confused about the source of the goods or services. *Airwick Industries, Inc. v. Alpkem Corp.,* 384 F Supp 1027, 1030 (DC

---

[3] Plaintiff's claim for trademark protection in the overall appearance of its gauges includes the design of the gauges as well as the descriptions on their face: "dynamo" on the ammeter gauge and "engine" on the tachometer. Plaintiff argues that those facial descriptions are unique, because they are technically inaccurate and because they had not previously appeared on similar gauges.

[4] A tradename is used to denote a company, business or partnership and its goodwill; a trademark identifies goods and services. McCarthy, *Trademarks, supra,* §4.4.

Or 1974). A determination of whether confusion between goods is likely generally involves consideration of several factors: the strength of the trademark, the similarity of the trademarks, marketing channels and methods, proximity of the goods, evidence of actual confusion and the degree of care likely to be exercised by a potential customer. *AMF, Inc. v. Sleekcraft Boats,* 599 F2d 341, 348 (9th Cir 1979).

 *1. Is There A Protectible Interest Under Federal Or State Law In The Name "Classic Instruments"?*

■■ For purposes of analysis, terms that are alleged to be trademarks are regarded as falling on a continuum divided into four categories: generic, descriptive, suggestive, arbitrary and fanciful. A generic term refers to the basic nature of goods and, in the majority view, cannot be protected as a trademark. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F2d 4, 9-11 (2nd Cir 1976); McCarthy, *Trademarks, supra,* § 12:1. A descriptive term portrays a characteristic of the article to which it refers. *Keebler Co. v. Rovira Biscuit Corp.,* 624 F2d 366, 374 n 8 (1st Cir 1980). It qualifies for trademark protection only if it has acquired a secondary meaning:

> " '[A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods * * * may become so associated in the public mind with such goods * * * that it serves to identify them and distinguish them from the goods * * * of others. When such an association exists, the name, mark, or symbol is said to have acquired a "secondary meaning," in which the original user has a property right which equity will protect against unfair appropriation by a competitor.' * * *

> " 'A trade-mark or a trade name may have acquired a secondary meaning in one locality but lack such a meaning in another.' " *Shoppers Fair of Arkansas, Inc. v. Sanders Co.,* 328 F.2d 496, 499 (8th Cir. 1964), quoting from *Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas,* 185 F Supp 895, 903 (ED Ark 1960).

*See Carter-Wallace, Inc. v. Proctor & Gamble Company,* 434 F2d 794, 802 (9th Cir 1970).

■■ A suggestive term denotes secondarily a particular product type and requires imagination to picture the nature of the product. *AMF, Inc. v. Sleekcraft Boats, supra,* 599 F2d at 349. An arbitrary term has no logical connection between the

name and the product. Suggestive and arbitrary terms do not require proof of secondary meaning in order to be protectible as a trademark. *Keebler Co. v. Rovira Biscuit Corp., supra,* 624 F2d at 374 n 8; *AMF, Inc. v. Sleekcraft Boats, supra,* 599 F2d at 349.

Defendants argue that summary judgment was proper on plaintiff's state common law and federal law claims for infringement of its name "Classic Instruments" because, as between plaintiff and CMC, CMC is a "senior user" of the term "Classic" and, therefore, cannot be precluded from its use. Alternatively, defendants VDO and Teleflex argue that the term "Classic" is generic and, therefore, incapable of trademark protection.[5]

 Although a senior user of a trademark cannot, within the same product line, be said to have infringed on a junior user's use of the same mark, *see* McCarthy, *Trademarks, supra,* § 16:1, CMC has not shown, for the purposes of production and sale of replicar automotive gauges, that it has a trademark in its logo "Classic." An inherently distinctive mark, such as an arbitrary or suggestive mark, allows protection immediately on adoption and use. McCarthy, *Trademarks, supra,* § 16:2. However, one obtains rights in a descriptive term only through actual use. In order to prove that a trademark exists in a descriptive term, one must prove the existence of a secondary meaning. Secondly, even assuming that CMC has a trademark in its logo "Classic," a fact question exists whether CMC's expansion into the production of replicar gauges was "natural." *See* 3 Callman, *Unfair Competition, Trademarks and Monopolies,* § 19:23 (4th ed 1983).[6]

 In summary, CMC has not shown that it has trademark rights in its logo "Classic," either by demonstrating that "Classic" is an inherently distinctive term and, therefore, that protection inhered immediately upon adoption and use, or by demonstrating that a secondary meaning has attached to its logo as a descriptive term. Therefore, it cannot

---

[5] CMC expressly takes no position on this alternative argument.

[6] The parties have not addressed the effect of CMC's expansion into the production of replicar automotive gauges on the issue of priority of rights in the putative mark.

be said as a matter of law that CMC is a senior user of the term "Classic" for trademark purposes in the context of the production of replicar automotive gauges.[7]

Having rejected CMC's privilege arguments, we now turn to the question of whether "Classic Instruments" is a generic term. Section 43(a) of the Lanham Act, 15 USC 1125(a)(1976), states in relevant part:

> "Any person who shall * * * use in connection with any goods or services, or any container or container for goods * * * any false description or representation, including words or other symbols tending falsely to describe or represent the same, * * * shall be liable to a civil action by * * * any person who believes that he or she is or is likely to be damaged by the use of any such false description or representation."

Under federal courts' interpretation of the Lanham Act, a generic term is incapable of trademark protection. *See, e.g., Keebler v. Rovira Biscuit Corp., supra,* 624 F2d at 374. Essentially, plaintiff contends that its name "Classic Instruments" should be protected under federal law, because it is either "suggestive" or "descriptive" and because it has acquired a secondary meaning.

Generic names are in the public domain, free for all to use. *Singer Mfg. Co. v. June Mfg. Co.,* 163 US 169, 16 S Ct 1002, 41 L Ed 118 (1896). In essence, a generic designation is the ultimate in a descriptive term. *Imported Auto Parts Corp. v. R.B. Shaller & Sons, Inc.,* 258 NW2d 797, 800 (Minn 1977), *citing* McCarthy, *Trademarks, supra,* § 12:4. To be "generic," a term must be in common use as the name of a genus of products. Evidence of "genericness" includes:

> "(1) Generic use by competitors which has not been contested by plaintiff.

> "(2) Generic usage by plaintiff. If the proponent of trademark status itself uses the term as a generic name, this is strong evidence of genericness.

> "(3) Dictionary definitions. While not determinative,

---

[7] CMC contends that plaintiff originally agreed to allow its gauges to be advertised by CMC as though they were CMC's product and that plaintiff imposed no reservations on the use of its name. Although an agreement between the parties similar to that alleged by CMC would be fatal to plaintiff's claim, *see* 3 Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* § 19.48 (4th ed 1983), Hettick's deposition testimony contradicts that allegation and, thus, raises an issue of material fact.

dictionary definitions are relevant and sometimes persuasive in determining public usage. But dictionary definitions cannot be conclusive of genericness, 'if for no other reason than that this would endow editors of such works with the power to destroy trademarks merely by defining them generically.'

"(4) Generic usage in the media such as in trade journals and newspapers.

"(5) Consumer surveys." McCarthy, *Trademarks, supra,* § 12:2 G. (Citations omitted.)

Although, typically, the determination of generic use is a question of fact, *see, e.g., Keebler v. Rovira Biscuit Corp., supra,* 624 F2d at 375-76, the question can be decided on summary judgment when there are no material conflicts in the evidence. *See, e.g., Miller Brewing Co. v. Joseph Schlitz Brewing Co.,* 605 F2d 990, 996 (7th Cir 1979), *cert den* 444 US 1102 (1980)(partial summary judgment based on collateral estoppel).

■ Defendants argue that reasonable minds cannot differ as to the usage of the term "Classic Instruments." We agree. "Classic" is defined by Webster's Dictionary, in a colloquial sense, as "an automobile of the period 1925-1942." *Webster's New World Dictionary of the American Language* (2d College ed 1974) 274. There is convincing evidence in the record to show that "classic" is used in trade journals and newspapers to define the genus of products related to the classic car market.

■ Plaintiff has not provided any relevant evidence that "Classic Instruments" is *other* than a generic term. Indeed, Hettick testified that he adopted the name "Classic Instruments" because it could be used freely due to the common use in the replicar trade of the word "classic." Clearly, plaintiff uses "classic" in connection with "instruments" to denote that the instruments it sells are of the type that belong to the genus of automobile known as "classic." We conclude that summary judgment was proper on plaintiff's federal claim for trademark protection in the name "Classic Instruments." That conclusion, however, does not, as a matter of law, preclude protection under Oregon common law.

■ In *Lift Truck, Inc. v. Bourne,* 235 Or 446, 385 P2d 735 (1963), the Supreme Court concluded that a generic name could acquire a secondary meaning:

"Unlike most of their other competitors, neither the plaintiff nor the defendants have elected to use manufacturers' brand names in their own business names, but rather have elected to use words that are essentially synonymous with the kind of service they offer. Accordingly, in this case, it is necessary to decide preliminarily whether such generic names can ever acquire a legally protectible secondary meaning. *Despite the defendants' contentions to the contrary, an arrangement of purely generic or descriptive words can acquire a secondary meaning and thereby create a protectible interest in a trade name. See e.g., The 88¢ Stores, Inc. v. Martinez,* 227 Or 147, 152, 361 P2d 809 (1961), and cases collected in Annotation, 150 ALR 1067, 1095 (1944). However, where the name in question is one primarily composed of generic or descriptive words, it is much more difficult to prove a secondary meaning than in cases where the words used in the trade name have some distinctive or identifying character of their own. Restatement, 3 Torts, § 731, comment e at 602 (1938). *Cf.* 3 Callman, Unfair Competition and Trade-Marks, § 77.3 at 1237 (2d ed 1950)." (Emphasis supplied.)

*See also Photo Sound Company. v. Corvallis,* 291 Or 105, 112, 628 P2d 733 (1981).[8]

 Because plaintiff's mark is either generic or descriptive, proof of a secondary meaning is required for it to be protected:

"To meet this burden, plaintiffs must prove that name acquired a special significance to the public so that a substantial number of present or prospective patrons of plaintiffs' * * * understand the designation when used in connection with its business not in its primary lexicographical sense, but as referring to a particular person or association. 3 Restatement of Torts § 716, comment b, p. 560 (1938)." *Frostig v. Saga Enterprises, Inc., supra,* 272 Or at 570.

*See also Woodburn Const. Co. v. General Development Co.,* 53 Or App 349, 632 P2d 23 (1981). In the context of defendants' summary judgment motions, plaintiff's evidence must raise a genuine issue of material fact as to the existence of a secondary meaning.

---

[8] The apparent anomaly under Oregon law, that a generic term has the capacity to acquire a secondary meaning, may be due to what McCarthy describes as confusion caused by some courts' referring to generic and descriptive categories as synonymous. *See* McCarthy, *Trademarks, supra,* § 12:5, n. 12.

Plaintiff submitted affidavit and deposition testimony that its customers purchase its gauges because of the gauges' "snob appeal," because other replicar owners have plaintiff's gauges, because plaintiff's gauges have been portrayed in trade magazines and because the majority of replicar manufacturers purchase plaintiff's gauges. Plaintiff's affidavit also states that it has received numerous letters and calls from customers who expressed confusion after having received a substitute gauge, when they anticipated receiving a Classic Instruments' gauge due to CMC's advertising, when ordering a replicar kit from CMC.

██ ██ Although secondary meaning and likelihood of buyer confusion are separate legal issues, actual confusion is an indicium of secondary meaning. *Lift Truck, Inc. v. Bourne, supra,* 235 Or at 450. The record on summary judgment raises a genuine issue of material fact whether plaintiff's name has acquired a secondary meaning. Summary judgment was improperly granted on plaintiff's claim that it has a protectible trademark under common law in its name "Classic Instruments."

*2. Is Plaintiff's Common Law Claim For Protection In The Overall Design of Its Gauges Preempted By Federal Law?*

Defendants argue that plaintiff's state common law claims for a protectible trademark in the overall design of its gauges are preempted by federal law. Essentially, they contend that state common law cannot prohibit the copying of an article that is not protected by patent or copyright. In *Sears, Roebuck & Co. v. Stiffel Co.,* 376 US 225, 84 S Ct 784, 11 L Ed 2d 661 (1964), the Stiffel Company had produced a lamp that Sears copied. The Court of Appeals found that confusion was likely among Stiffel's prospective customers and, under the applicable Illinois unfair competition law, that Sears had infringed Stiffel's trademark in its product design. The Supreme Court disagreed and reversed:

"To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public.

"* * * * *

"Sears has been held liable here for unfair competition because of a finding of likelihood of confusion based only on the fact that Sears' lamp was copied from the Stiffel's unpatented lamp and that consequently the two looked exactly alike. Of course there could be 'confusion' as to who had manufactured these nearly identical articles. But mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying or an award of damages for copying that which the federal patent laws permit to be copied." 376 US at 231.

In *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 US 234, 84 S Ct 779, 11 L Ed 2d 669 (1964), Day-Brite had secured a design patent on a light fixture. Compco manufactured and sold a similar fixture. The Court of Appeals concluded that the fixture design had acquired a secondary meaning. Again, the Supreme Court disagreed and reversed, concluding that "if the design is not entitled to a design patent or other federal statutory protection, then it can be copied at will." 376 US at 238. The Court noted an exception to the general rule, which is that a state has the right, irrespective of lack of patent or copyright, to prevent the misleading of customers as to the source of goods, and it has the power to impose liability on those who deceive the public by "palming off their copies as the original." 376 US at 238.

Later cases have limited *Sears* and *Compco.* In *Kewanee Oil Co. v. Bicron Corp.,* 416 US 470, 493, 94 S Ct 1879, 40 L Ed 2d 315 (1974), the Supreme Court held that state trade secret law is not preempted by federal patent law. *See also Goldstein v. California,* 412 US 546, 570, 93 S Ct 2303, 37 L Ed 2d 163 (1973). Although *Sears* and *Compco* have been interpreted narrowly, *see* McCarthy, *Trademarks, supra,* § 7:25, they have been applied when the facts were similar. In *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F2d 1423 (CAFC 1984), Litton alleged that Whirlpool had infringed on its design patent and had copied unpatented aspects of its microwave oven in violation of section 43(a) of the Lanham Act, the Minnesota Uniform Deceptive Trade Practices Act and the Minnesota common law of unfair competition. The Court of Appeals held that the state claims were preempted:

"The district court, in this case, erred in reaching any element of the state causes of action. The district court should have disposed of these actions, that is, in view of the preemption doctrine as applied in *Sears, Roebuck & Co. v. Stiffel Co.,*

\* \* \* ('[B]ecause of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying.') \* \* \*

"\* \* \* \* \*

"No Supreme Court case \* \* \* limits the effect of the *Sears-Compco* doctrine with respect to factual situations similar to those at issue in the *Sears* and *Compco* cases.

"In the present case, the microwave ovens which Litton alleges that Whirlpool copied are protected by a valid design patent. The type of design at issue here, therefore, is clearly protectible by federal statute. *The key to determining whether the Sears and Compco cases prohibit a state action is whether a design is of the type on which a patent may issue.*" 728 F2d at 1448. (Emphasis supplied.)

Plaintiff's contention that Hettick used his own artistic impressions to create a new, innovative gauge design is, essentially, a concession that the "design is of a type on which a patent may issue." Therefore, summary judgment was proper as to plaintiff's state common law claim for trademark infringement in its product design on the basis of preemption under *Sears* and *Compco. See Litton Systems, Inc. v. Whirlpool Corp., supra,* 728 F2d at 1448.

*3. Did Plaintiff Raise A Genuine Issue Of Fact Whether Defendants Had "Passed Off" Their Gauges As Plaintiff's Gauges?*

Although plaintiff's state common law claim for trademark infringement in its product design is preempted, its common law claim that defendants "passed off" CMC's gauges as plaintiff's is not preempted. *See Compco Corp. v. Day-Brite Lighting, Inc., supra,* 376 US at 238. Plaintiff's complaint alleged, in relevant part:

"VII.

"Defendants, and each of them, have willfully, wantonly, and intentionally created, manufactured, marketed, and sold lines of automobile gauges and instruments that are nearly identical in name or appearance or both to those of plaintiff. They continue to do so. The use of plaintiff's design and name, both together and apart, have caused and will continue to cause confusion and deception on the part of the consuming public.

"VIII.

"Defendants have relied on plaintiff's advertising campaign, and have falsely advertised their own gauges and instruments as those of plaintiff."

■■■ "Implied passing off" occurs when someone uses a picture or sample of its competitor's product, intentionally impliedly representing that its product is that of its competitor. Passing off is a form of unfair competition, McCarthy, *Trademarks, supra* § 25:1 D., that has been held to be a violation of section 43(a) of the Lanham Act. *See Nike, Inc. v. Rubber Mfrs. Assn., Inc.,* 509 F Supp 919, 924 and n 2 (SD NY 1981). In his affidavit Hettick alleged:

"Classic Motor Carriages continued to show photographs of our products (on which our name Classic Instruments was plainly visible) even after they stopped distributing our product. Their sales brochure was reprinted after they stopped ordering gauges from us, but the same photographs continued to appear without change and the wording "CLASSIC INSTRUMENTS" continued to identify the gauges used in the dash panel of the Bugatti replicar drawing and the drawing of the Gazelle kit car. Classic Motor Carriages continued to consciously display our product in their catalog to take advantage of the consumer's name-familiarity with our products even though defendant knew facsimile gauges would be shipped to the consumer.

"Classic Motor Carriages continued to advertise and display our products in their airport automobile displays nationwide for the same reasons even though defendant knew facsimiles of our gauges would be shipped to the purchaser.

"Classic Motor Carriages continued to allow cars at kit car shows in their or their distributors' booths to show gauges manufactured by Classic Instruments, Inc. even though they shipped only facsimile gauges. The latest instance of this of which I am aware was at the display booth of Classic Motor Carriages at Caesar's Palace, 2nd Annual Kit Car Show, Las Vegas, Nevada, during August 1983 (and being almost two and one-half years after defendant quit using Classic Instruments' products)."

■■■ Hettick's affidavit raises a genuine issue of material fact as to plaintiff's claim against CMC for passing off. However, there is no allegation in Hettick's affidavit, and no

evidence to show, that either VDO or Teleflex knowingly participated in any passing off. Therefore, as to VDO and Teleflex, summary judgment was appropriate on plaintiff's claims of passing off.

### 4. Is There A Protectible Interest Under Federal Law In Plaintiff's Gauge designs?

■■■■■■ Plaintiff's federal law claim for trademark infringement in its product design is similar to its state common law claim. However, there is no conflict between federal patent laws and trademark infringement claims under section 43(a) of the Lanham Act. *Truck Equipment Serv. Co. v. Fruehauf Corp.,* 536 F2d 1210, 1214-15 (8th Cir 1976), *cert den* 429 US 861. A claim for product design simulation, sometimes referred to as "trade dress" infringement, is stated under section 43(a) of the Lanham Act if a plaintiff alleges that nonfunctional aspects of its product that have acquired a secondary meaning in the mind of the relevant public have been copied by a competitor. *Truck Equipment Serv. Co. v. Fruehauf Corp., supra,* 536 F2d at 1214. In order to prove its claim of infringement under the Lanham Act, plaintiff must prove that the appearance of defendants' product is confusingly similar to its product, that the copied features are primarily nonfunctional and that plaintiff's product's appearance has acquired a secondary meaning. *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F2d 966, 980 (11th Cir 1983). To deny defendants summary judgment, plaintiff must demonstrate that a genuine issue of material fact exists as to *each* of the elements.

■■■ ■■■ Defendants do not contend that no issue of fact exists as to the first element, i.e., whether defendants' and plaintiff's product designs are confusingly similar.[9] As to the

---

[9] Defendants argue that there can be no trademark infringement under state or federal law when the name of the manufacturer is "clearly displayed." They cite *American Rolex Watch Corp. v. Ricoh Time Corp.,* 491 F2d 877 (2d Cir 1974) and *Litton Systems, Inc. v. Whirlpool Corp., supra.* Those cases are distinguishable. In *American Rolex,* the Court of Appeals affirmed after concluding that the trial court's finding that the defendant had clearly labeled its product was not clearly erroneous. 471 F2d at 78. In *Litton Systems,* the Court of Appeals reversed, holding that the trial court had committed clear error in its finding as to likelihood of confusion. 728 F2d at 146. The Court of Appeals noted that the "legal effect of labelling a product with its manufacturer's name depends or may depend on both the prominence of the label and the type of the product." 728 F2d at 146. Whether CMC's name and logo are adequately displayed on its gauges to prevent confusion must be based on several

third element, "secondary meaning," our conclusion under the state law analysis, that a question of fact exists, is applicable.[10] The second element, functionality, is the primary issue under the federal statutory claim. In order to determine whether there is a genuine issue of material fact, we must define the term "functionality."

The requirement of nonfunctionality in section 43(a) claims for trade dress infringement or product design imitation was imported into Lanham Act actions from the common law of unfair competition. *See Note,* "The Problem of Functional Features: Trade Dress Infringement Under Section 43(a) of the Lanham Act," 82 Col L Rev 77, 81 (1982). Functionality has its genesis in the judicial theory that there is a fundamental right to compete through imitation. *In re Morton-Norwich Products, Inc.,* 671 F2d 1332, 1336 (CCPA 1982).

The concept of functionality is broadly divided into mechanical and aesthetic. Those categories roughly correlate with utility and design patent subject matter. However,

"regardless of what 'kind' of functionality we speak, we are, in all cases, dealing with the perception of a conflict between the right of the public to use unpatented subject matter in a competitive economy, on the one hand, and the desirability of protecting the entrepeneur's investment in his good will and the public from confusion on the other. The decisions in all of the cases lie along this central dividing line. Most turn upon the definition of functionality adopted by the court and the application of that definition to the facts." Zelnick, "The Doctrine of 'Functionality,'" 73 Trademark Reporter 128, 129-30 (1983).

Section 742 of the *Restatement of Torts* defines functionality:

"A feature of the goods is functional * * * if it affects their purpose, action or performance, or the facility or economy of

---

factors, including the prominence of CMC's name and logo and the type of advertising and sales promotions utilized by CMC. The question cannot be resolved on this record.

[10] Although we previously concluded that plaintiff raised a genuine issue of material fact as to secondary meaning in the *name* "Classic Instruments," the evidence offered equally supports the conclusion that an issue of fact remains as to the existence of a secondary meaning in plaintiff's product design.

processing, handling or using them; it is non-functional if it does not have any of such effects."

The comment to Section 742 notes, in relevant part:

"[A] feature is non-functional if, when omitted, nothing of substantial value in the goods is lost. A feature which merely associates goods with a particular source may be, like a trademark or a tradename, a substantial factor in increasing the marketability of the goods. But if that is the entire significance of the feature, it is non-functional; for its value then lies only in the demand for goods associated with a particular source rather than for goods of a particular design."

The *Restatement* definition of functionality provides little help in analyzing complex product configuration problems, because it is so broad as to limit protection to those features of goods that are little more than trademarks affixed to the goods. *See* Zelnick, "The Doctrine of 'Functionality,' " *supra,* 73 Trademark Reporter at 131-32.

Defendants argue that each aspect of plaintiff's gauges is "functional" and, therefore, that the gauges themselves are "functional":

"[T]he bezel holds the lens in place, which in turn, protects the dial face from dust and dirt * * *. The needle * * * indicates what the gauge is designed to measure. * * * The numerals * * * indicate the quantity the gauge is to measure. Radically extending lines * * * serve to indicate the quantity the gauge is designed to measure. The names on the gauge * * * describe what the gauge is to measure and distinguish the function of one gauge from another." CMC brief at 20.

Having defined the utilitarian elements of plaintiff's gauges, defendants argue that no genuine issue of material fact exists as to functionality and, therefore, that summary judgment was appropriate. We reject defendants' definition of functionality, as well as their conclusion that plaintiff's gauges are, as a matter of law, *de jure* functional.

In *In re Morton-Norwich Products, Inc., supra,* 671 F2d at 1337, the court noted that the label "functional" has dual significance: it is used in the lay sense to indicate utilitarian characteristics (*de facto* functionality), and it is used to denote a legal conclusion (*de jure* functionality). Defendants' reference to the utilitarian characteristics of plaintiff's product, while probative, is not dispositive:

"[A] discussion of 'functionality' is *always* in reference to the design of the thing under consideration (in the sense of its *appearance*) and *not* the thing itself. One court, for example, paraphrasing Gertrude Stein, commented that 'a dish is a dish is a dish.' *Hygenic Specialties Co. v. H.G. Salzman, Inc.*, 302 F2d 614, 621, 133 USPQ 96, 103 (2nd Cir 1962). No doubt, by definition, a dish always functions as a dish and has its utility, but it is the appearance of the dish which is important in a case such as this * * *." 671 F2d at 1338. (Emphasis in original.)

The *Morton-Norwich* court reasoned that most designs result in the production of articles containing features that are utilitarian. Examination of the possibility of trademark protection is not primarily concerned with the existence of pure utility, but with the degree of design utility:

"Thus, it is the 'utilitarian' *design* of a 'utilitarian' *object* with which we are concerned, and the manner of the use of the term 'utilitarian' must be examined in each occurrence." 671 F2d at 1339. (Emphasis in original.)

In that context, "utilitarian" is defined as "superior in *de facto* function or economy of manufacture"; "superiority" is determined "in light of competitive necessity to copy":

"What this phrase must mean is not that the generic *parts* of the article * * * are essential, but * * * that the particular *design* of the whole assembly must be essential." 671 F2d at 1339. (Emphasis in original.)

The *Morton-Norwich* court listed a number of factors relevant to a determination of whether a particular design is *de jure* functional: utilitarian advantage of a design, other available design alternatives and inexpensive or simple manufacturing techniques. 671 F2d at 1339. Other factors may also be relevant.

Although defendants' evidence of the utilitarian elements of plaintiff's gauges is probative on the issue of *de jure* functionality, it is not conclusive. In a product design imitation case, the functionality inquiry must ultimately focus on the competitive need to imitate the overall design of plaintiff's gauges, in light of other available design alternatives. *See In re Morton-Norwich Products, supra* 671 F2d at 1341. As one court noted, "[t]he issue of functionality has been consistently treated as an issue of fact." *Vuitton et fils S.A. v.*

*J. Young Enterprises, Inc.,* 644 F2d 769, 775 (9th Cir 1981).[11]

In so defining "functionality," we have implicitly rejected the line of cases relied on by defendants, from *Pagliero v. Wallace China Co.,* 198 F2d 339 (9th Cir 1952), through *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F2d 912 (9th Cir), *cert den* 452 US 941 (1980), that articulate a theory of "aesthetic functionality." Under that theory, visually attractive and asthetically pleasing designs are considered functional in an aesthetic sense. *See* McCarthy, *Trademarks, supra,* § 7:26D. The aesthetic functionality concept has been defined as "any feature which contributes to the commercial success of the product is functional—a sort of 'commercial functionality.' " Zelnick, "The Doctrine of 'Functionality," *supra,* 73 Trademark Reporter at 143-44. It has been severely criticized as overly broad and vague. *See, e.g., In re D.C. Comics, Inc.,* 689 F2d 1042, 1043-50 (CCPA 1982) (Rich, J., concurring); McCarthy, *Trademarks, supra,* § 7:26E; Zelnick, "The Doctrine of 'Functionality'," *supra,* 73 Trademark Reporter at 147-48.[12] We conclude that genuine issues of material fact exist as to each of the three elements necessary to show trademark infringement of product design under the Lanham Act.

## II. COMMON LAW INTERFERENCE WITH BUSINESS RELATIONSHIP.

Plaintiff's second assignment of error contends that the trial court erred in granting summary judgment on plaintiff's claims against VDO and Teleflex for interference with a business relationship. Plaintiff's complaint alleges that it had a business relationship with CMC and that VDO and Teleflex intentionally and wilfully interfered with that relationship.

---

[11] Citing Hettick's deposition testimony, defendants characterize plaintiff's claim for trademark protection in its gauge design as one for protection against production of any light-faced, antique-appearing gauge. Plaintiff stressed in its brief and at oral argument that it only sought protection against production of any confusingly similar gauge.

[12] In view of our conclusion that it is the overall design of plaintiff's gauges that forms the basis for its trademark protection claim, defendant's contention that light-faced, antique-appearing car gauges have been manufactured in the past and that plaintiff's gauge designs are "in the public domain" must fail. Defendants have not demonstrated, *as a matter of law,* that existing light-faced, antique-appearing gauge designs of VDO or other gauge manufacturers are indistinguishable from plaintiff's designs. *Cf. Application of World's Finest Chocolate, Inc.,* 474 F2d 1012, 1014 (CCPA 1973).

■■ ■■ The elements of intentional interference with a business relationship are: the defendant intentionally interfered with the relationship; the defendant interfered either with an improper motive or by using improper means; and, as a result, the plaintiff was damaged beyond the fact of the interference itself. *Ron Tonkin Gran Tourismo, Inc. v. Wakehouse Motors, Inc.,* 46 Or App 199, 208, 611 P2d 658 (1980). Plaintiff argues that there were "facts" before the court demonstrating interference with a business relationship. However, as to VDO, those facts are not specified. The evidence shows that VDO never sold any light-faced gauges to CMC. Plaintiff fails to specify what damage it suffered as a result of VDO's alleged interference. Summary judgment was proper on plaintiff's claim against VDO for intentional interference with a business relationship.

As to Teleflex, the question is somewhat closer. The evidence shows that the business relationship between plaintiff and CMC began to fracture as early as 1979, due to plaintiff's apprehension about the timeliness of CMC's payments. Hettick testified that there were disagreements over the resolution of CMC's payment problems. In December, 1980, CMC demanded a specific date for January, 1981, deliveries; plaintiff did not meet that delivery date. In February, 1981, CMC solicited a bid for automotive gauges from Teleflex. In April, business relations between plaintiff and CMC terminated. Teleflex did not sell any gauges to CMC until July, 1981.

■■ In summary, the evidence shows that the business relationship between plaintiff and CMC was strained at the time when CMC solicited a bid from Teleflex. Still, we cannot say, as a matter of law, that the relationship had terminated. The improper means alleged, the use of plaintiff's alleged trademark, rises or falls with plaintiff's trademark infringement allegations. As to the damage element of the claim, Hettick's deposition testimony states that plaintiff's market share diminished from 97% to 70% during the relevant time period. Hettick estimated that 21% to 23% of the market share belonged to Teleflex on the basis solely of its new business relationship as CMC's automotive gauge supplier. We conclude that the evidence presents a genuine issue of material fact as to whether Teleflex intentionally interfered with the business relationship between plaintiff and CMC.

Therefore, the trial court erred in granting summary judgment on plaintiff's claim against Teleflex for intentional interference with a business relationship.

### III. COMMON LAW BREACH OF FIDUCIARY RELATIONSHIP.

Plaintiff's third assignment of error contends that the trial court erred in granting summary judgment on plaintiff's claim against Teleflex for breach of a fiduciary relationship. Plaintiff's claim alleged that Teleflex was in a relationship of trust and confidence with plaintiff from 1978 to 1982 and that Teleflex appropriated and converted plaintiff's designs, blueprints and art work and used them to create competitive gauges. Teleflex does not deny that there was a fiduciary relationship between it and plaintiff. It argues, first, that there was no "agency" relationship between it and plaintiff, second, that it could not. have breached any duty because plaintiff's "gauges * * * are sold on the open market, and [the] face designs are obvious to anyone purchasing such gauges * * *," and, third, that plaintiff failed to present sufficient evidence to defeat summary judgment.

Although, in a technical sense, Teleflex was neither a fiduciary nor an agent, we conclude that it had a duty not to use plaintiff's blueprints or specifications in any way that might harm plaintiff. In *Kamin v. Kuhnau,* 232 Or 139, 148, 374 P2d 912 (1962), the court stated:

> "The fact that the idea was already developed by others may make it less valuable in the market. Yet the information or knowledge may give to the possesser a commercial advantage over his competitors. This advantage constitutes value, and the disclosure of the information which creates the advantage may be sufficient to raise the implied agreement not to appropriate it."

In *Booth v. Stutz Motor Car Co.,* 56 F2d 962 (7th Cir 1932), the plaintiff had designed a new car. He sent the blueprints and plans for the car to the defendant for possible production of the car in the defendant's plant. Subsequently, the defendant informed the plaintiff that the defendant was no longer interested in his plans. However, the defendant then produced a car that contained features of the plaintiff's blueprints and designs. Reversing a judgment of dismissal, the court held that, to the extent that the plaintiff's plans, communicated in

confidence to the defendant, did enter into the design of the car, the defendant had inequitably appropriated those plans and it should account to him. *See also Schreyer v. Casco Products Corp.,* 190 F2d 921 (2nd Cir 1951), *cert den* 341 US 913.

 Teleflex's second argument, that it could not have breached any duty, because plaintiff's gauges are sold on the open market and the face designs are obvious, lacks merit. The relevant inquiry is whether Teleflex used plaintiff's blueprints and specifications communicated to it in confidence to plaintiff's detriment:

> "Defendants argue that plaintiff had disclosed his alleged improvements in design by advertising and by the sale of the trucks to others, and that the defendants or anyone else could ascertain from those sources the nature of the alleged improvements. The fact that the design and process of manufacturing a truck body similar to plaintiff's could have been ascertained from these sources does not foreclose plaintiff from a remedy for unfair competition. As the court in *Franke v. Wiltschek,* 209 F2d 493, 495 (2d Cir 1953) pointed out, the real question is not whether the disclosee *could have* obtained the disclosed information elsewhere, but rather whether in fact he *did* so obtain it.
>
> "* * * * *
>
> "The cases adopting the higher standard of 'commercial morality' emphasize the breach of the confidence reposed in the defendant, rather than the existence of the trade secret. As the court stated in *Vulcan Detinning Co. v. American Can Co.,* 72 NJ Eq 387, 67 A 339, 343 (1907), 'too much emphasis has perhaps been placed upon the element of absolute secrecy in the process, and that not enough stress has been laid upon the inequitable character of the defendants' conduct in making a use of such process that was inimical to the complainant's interests. * * * [T]he secrecy with which a court of equity deals is not necessarily that absolute secrecy that inheres in discovery, but that qualified secrecy that arises from mutual understanding, and that is required alike by good faith and by good morals.' On similar grounds the element of novelty has been minimized, the emphasis being placed upon the unfairness to plaintiff if defendant is permitted to appropriate the plaintiff's idea." *Kamin v. Kuhnau, supra,* 232 Or at 149, 151. (Citations omitted; emphasis in original.)

Similarly, in *Smith v. Dravo Corp.,* 203 F2d 369 (7th Cir 1953),

in response to the defendant's claim that it could not have breached any fiduciary duty because 100 of the plaintiff's devices were in public use at the time of the action, the court stated that the correct inquiry should be how the defendant learned of the plaintiff's design. The court stated further that, in order for a product to be a "trade secret," it need not have reached the status of an invention, but need only represent in some considerable degree the independent efforts of its claimant.

 Teleflex's third argument is that there was insufficient evidence to raise an issue of fact whether it had used plaintiff's blueprints or specifications. We conclude that the similarity of plaintiff's and Teleflex's gauges is sufficient to raise an issue of fact. *See International Industries, Inc. v. Warren Petroleum Corp.*, 99 F Supp 907, 913-14 (D.C. Del 1951) (similarity of defendant's product with that contemplated by plaintiff was strong proof that one was copied from the other). The trial court erred in granting summary judgment on plaintiff's claim against Teleflex for breach of a fiduciary relationship.[13]

Reversed and remanded for trial on plaintiff's claims for common law trademark infringement of plaintiff's name "Classic Instruments" against CMC, VDO-Argo and Teleflex; common law intentional "implied passing off" against CMC; Lanham Act, section 43(a), trademark infringement of plaintiff's product design against CMC, VDO-Argo and Teleflex; Lanham Act, section 43(a), intentional "implied passing off" against CMC; intentional interference with business relationship against Teleflex; and breach of fiduciary relationship against Teleflex; otherwise affirmed.

---

[13] In view of our disposition of this case, plaintiff's fourth assignment of error, that the trial court abused its discretion in failing to delay its ruling on defendants' summary judgment motions until after plaintiff had obtained discovery of allegedly relevant documents, is moot.