CHAMPIONS GOLF CLUB, INC., Plaintiff,

v.

SUNRISE LAND CORP., et al., Defendants.

Civ. No. 93–5084.

United States District Court, W.D. Arkansas, Fayetteville Division.

Feb. 11, 1994.

Tom Alexander, Matt Hennessy, Alexander & McEvily, Houston, TX, C. James Bushman, Browning, Bushman, Anderson & Brookhart, Houston, TX, for plaintiff.

John R. Elrod, Elrod & Lee, Siloam Springs, AR, for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is a case in which plaintiff, Champions Golf Club, Inc., located in Houston, Texas, brought suit against various defendants, which operate a Golf and Country Club in Rogers, Arkansas, known as "Champions

Golf & Country Club." It is alleged that use of this name by the Arkansas group violates certain of plaintiff's rights protected by certain provisions of federal law (the Lanham Act, 15 U.S.C. §§ 1114 and 1125), and the laws of Texas and Arkansas, including the common law. The court has jurisdiction under 28 U.S.C. § 1331 because this cause of action arises under the laws of the United States, and under 28 U.S.C. § 1332, by reason of the complete diversity of citizenship of the parties.

After ruling on a number of pretrial issues, the case was tried to a jury on December 14 and 15, 1993. At the conclusion of all of the evidence, the court submitted to the jury the issues of whether the defendants had infringed plaintiff's trademark or service mark and whether defendants' conduct constituted unfair competition, including false designation of origin.

As to the trademark infringement claim, the jury was told in the court's instructions that, in order to prevail, plaintiff must show that it had established the word, "Champions," as a service mark for its services, and that the defendants had infringed that mark by using it in a manner likely to cause confusion, mistake, or deception among persons using ordinary care and prudence in the purchase of golfing services.

In this respect, the jury was told that the plaintiff sought monetary damages for such infringement, and that to be entitled to such monetary damages, it must prove actual confusion, mistake or deception caused by the use of similar marks by plaintiff and defendants in connection with golfing services.

The court also advised the jury that plaintiff also sought injunctive relief and that that was a matter for the court to decide, but the jury would be asked whether the plaintiff had established a likelihood of confusion as a result of the use of the similar marks, and that the court might award injunctive relief if the jury found that there was a likelihood of confusion even though it found no actual confusion existed. The jury was given further instructions to explain the law in respect to infringement and the terms employed by the court, and was also instructed on plain-

tiff's theory that defendants' conduct constituted unfair competition.

In respect to those claims, the court submitted interrogatories asking whether the jury found that plaintiff's service mark was infringed and whether defendants used the service mark in a manner that caused actual confusion. Both of these interrogatories were answered "yes," but no damages were awarded, the jury answering the damage interrogatory by inserting "$0.00" in the blank provided. The jury found that the defendants had not unfairly competed with the plaintiff.

During the course of the trial, primarily on the court's own initiative because it had not been well pled, the question arose as to whether Arkansas' anti-dilution statute, Ark. Code Ann. § 4–71–113 (Repl.1991), more particularly discussed below, might apply. That statute appeared to cover not only marks registered under Arkansas law, but also "a mark valid at common law, or a trade name valid at common law. . . ." For this reason, the jury was instructed on the issue of when and how a mark or trade name acquires a secondary meaning, and was asked whether it found that "plaintiff's name 'Champions' had acquired a secondary meaning in the marketplace as defined for you in the court's instructions." That interrogatory was also answered "yes."

After the interrogatories were answered by the jury, it was excused, and counsel were advised by the court that, since the only issue left was one of injunctive relief to be determined by the court, no judgment would be entered until the court considered certain post-trial motions that it expected to be filed raising substantial legal issues in respect to the question of whether an injunction should issue. A time schedule was established for the filing of any such motions and briefs.

Presently before the court is defendants' motion, filed under Rule 50 of the Federal Rules of Civil Procedure, denominated as "Defendants Motion for Judgment as a Matter of Law" and plaintiff's motion filed pursuant to Rules 50 and 58 titled, "Motion for a Judgment on the Verdict and as a Matter of

Law." [1]  The sole issue before the court is whether the court should, or is required, or permitted, to grant the plaintiff injunctive relief.  The court has considered the motions and briefs of the attorneys for the parties, and is prepared to rule.

### Champions of Houston

One of the founders of Champions Golf Club, Jack Burke, testified at the trial that he and Jimmy Demaret in, 1957 or 1958, conceived the idea of establishing a first-rate golf course and club in Houston which, after a great deal of work and expenditure of funds, resulted in the establishment of a golf course that has become world-renowned.

Mr. Burke was a part-time golfer, teaching golf in White Plains, New York, for some years prior to 1950.  During that period of golfing history there were no golf professionals who made their living playing golf full time.  Mr. Burke, who was obviously an accomplished golfer early in life, as other golfers did, played in some tournaments, primarily in winter.

In approximately 1950, he "struck out to play full time."  He played golf as a touring professional during most of the 1950's until Champions was conceived and opened in approximately 1958.  During that time he became a consistent winner on the circuit, compiling the following impressive record:

Ryder Cup Team—1951, 1953, 1955, 1957, 1959

Player of the Year 1956

Vardon Trophy 1952

Masters Champion 1956

PGA Champion 1956

Member of the PGA Hall of Fame

Career Victories—17

Mr. Burke's testimony was that he is the only person in the history of professional golf to have won four major tournaments in a row, amassing during that stretch an astoundingly minimal, at least by today's standards, total winnings of $8,000.

His co-founder and close friend, Jimmy Demaret, as any person with even a minimal knowledge of golfing history would recognize, was also an illustrious pioneer in the history of professional golf.  His record on the tour was as follows:

Ryder Cup Team—1940, 1947, 1949, 1951

Vardon Trophy 1947

Masters Champion 1940, 1947, 1950

Member of the PGA Hall of Fame

Career Victories—31

In the late 1950's, Mr. Burke and Mr. Demaret decided they would like to get off of the tour and establish an outstanding championship golf course.  Since there were few, if any, of those in Texas or, in fact, the southern region of the United States, and since they both resided in Houston, they decided to attempt to establish the course in the Houston area.

Since they had very minimal assets, and since they had no experience in the construction, development or promotion of golf courses, or anything else for that matter, they decided to talk with an acquaintance and friend, Jack Valenti,[2] who had, in 1952, opened an advertising and political consulting agency in the Houston area.[3]

Mr. Valenti was immediately enthused by the plan of Mr. Burke and Mr. Demaret, and

1.  It is not clear that, procedurally, either was technically correct.  As already indicated, the jury awarded no damages, and the attorneys for the parties agreed at the trial that the only remaining issue was whether the court, exercising its equity powers, should grant plaintiff's motion for an injunction.  There is, technically, no jury verdict to set aside.  The matter of an injunction is and always has been the duty and function of the court to decide.

2.  When Mr. Valenti was asked how he had become acquainted with Jack Burke, he said: "I've known Jack Burke all my life.  We grew up together, as young boys, so I guess I've known

him since we were early teenagers. . . . We were friends and, of course, he became a world-famous golf professional, one of the greatest in the world, and our friendship has stayed nourished and alive through all the years, as I said, since we were boys."

3.  Of course, Mr. Valenti later became well-known throughout the country and world as the special assistant to President Lyndon B. Johnson, who hired him within hours after the assassination of President John F. Kennedy.  Since 1966, Mr. Valenti has been the president and chief executive officer of the Motion Picture Association of America.

quickly agreed to aid them in their endeavor. Very early in their discussion the question arose as to the name that would be given the golf course and club that these three men envisioned and began to move toward reality. Jack Valenti quickly proclaimed to Mr. Burke and Mr. Demaret that it could be called nothing other than "Champions," because it was being developed by and would be connected with two outstanding and respected champions. Mr. Valenti's testimony in this respect was:

> I'd laid out a plan for Jackie and Jimmy and suggested that we wanted to have a name that would make this the preeminent golf course of its kind in the world. Since Jimmy Demaret and Jackie Burke were both winners of major golf tournaments, the Masters and the PGA, I thought that the proper name for it would be the Champions Golf Club which would denote their connection with it and would declare to the world that this was a supreme golf course without parallel anywhere.

When he was asked why they chose the name Champions as opposed to copying the name of some other famous golf course [4], he said:

> One, I wanted it to be singular. As the lawyers say, *sui generis,* unlike any of its kind. And to do that, the name could not have any connection, genetically or otherwise to any other golf course. And, Number 2, we wanted to make that name synonymous with quality, the finest, the best that there was in the world of golf. It was my judgment as the public relations, hopefully professional, that this would be a name to be suitably impressed on the minds of everybody, particularly those who played golf, as something unique, different, by itself.

Mr. Burke, Mr. Demaret, and Mr. Valenti concluded that they would not go further with their plans unless and until they were able to recruit 500 members who would pay $500 each. They accomplished that in short order, and the course was opened in late 1957 or early 1958.

From the beginning, Champions had a significant place in and played an important role in the history of professional golf, hosting such prestigious events as the Ryder Cup matches of 1967, United States Open of 1969, the Nabisco Championship of 1990, the U.S. Amateur Championship of 1993, and Champions International, a stop on the PGA tour.

As an example of the effort required and expenses that are incurred by a major golf course to attract a major championship, Mr. Burke testified that it took eight to ten years to attract the U.S. Amateur Championship and that, in order to entice the promoters of that tournament to choose Champions, it was necessary to spend $780,000 to modernize the facilities. He said that the U.S. Amateur Championship had never before been held in Texas, and that the tournament broke all attendance records for that event.

When asked if he and Mr. Burke and Mr. Demaret accomplished what they set out to do in respect to their desire to create a golf course that was world-renowned, Jack Valenti testified:

> Oh, I think we did. I left Houston in 1966 and have now become an addicted golfer myself. I played then, but not well, still don't play well, but I am passionate about golf and I have played courses all over the world and whenever I tell anybody I'm from Houston, Texas, inevitably somebody would say, 'Have you played Champions?' Then I went through my marvelously joyful routine of saying not only have I played it, I made it. I was part of it.

Champions consists of two eighteen-hole golf courses, Cypress Creek and Jackrabbit, occupying approximately 300 acres. There is a development of approximately 60 homes around Cypress Creek. According to Mr. Burke, the first two were homes constructed by him and Mr. Demaret in approximately 1962. It took 25 years to complete the development.

The present membership fee for a full membership is $15,000 and the monthly fee for a family membership is $260.00. In addition to a full membership, the club offers other memberships for a lesser fee, such as a

---

4. When Jack Burke was asked that, he replied, "You just don't do that."

junior membership, and one for out of town members.

There were approximately 800 full members at the time of the trial, and approximately 50 out of town members. There is a waiting list for membership. The total club revenue is approximately $5,000,000 per year. Non-members who belong to other clubs around the country are allowed to play at Champions on a reciprocal basis, and the club collects guest fees from such golfers of nearly $600,000 per year.

The club does no advertising, and, in fact, Mr. Burke testified that "if a club has to advertise, it is in serious trouble." The club has no desire to either franchise the name or to branch out and create satellite golf clubs around the country. In respect to that, Mr. Burke testified:

> A club is a very private thing for families, and I don't think franchising is the way to do it. I think its a private matter and I think there should be one and that's it— one, and one only.... Why aren't there 500 Pebble Beaches?

It first came to the attention of Mr. Burke or other officials of Champions that Champions of Northwest Arkansas existed or was contemplated, in late 1988 or early 1989. This resulted in a letter dated April 27, 1989, from an attorney representing Champions of Houston, addressed to the "Founders of the Promotion Called Champions Golf and Country Club," advising them that they did not have permission to use the Champions name and that they should cease and desist from doing so. Another similar letter was subsequently mailed. When it became obvious that such requests were to no avail because they were ignored, a lawsuit was filed in federal district court in Houston. When that lawsuit was dismissed on jurisdiction or venue grounds, this matter was filed.

### Champions of Northwest Arkansas

In late 1988, a promoter, Fred Berckefeldt descended upon Northwest Arkansas from Freedonia, Kansas, where he had apparently been involved in other promotions. Although there was little specific evidence adduced at the trial in this respect, it appears that members of Champions of Northwest Arkansas learned at some point that Mr. Berckefeldt had been convicted of a felony apparently in respect to some of these other promotions, and had been a party to multiple lawsuits in respect to them.

In late 1988 he started the Northwest Arkansas promotion, and contacted a golf course architect and consultant, Donald R. Sechrest. Additionally, he apparently induced professional golfer, Bruce Lietzke, to become involved in the promotion, although it was not apparent from the evidence that Mr. Lietzke had much to do with the promotion and development other than to lend his name to it.

Mr. Berckefeldt quickly publicized his idea through the news media and by use of advertising and other promotional efforts, apparently including the Wall Street Journal. The plan that he announced was to build an outstanding real estate development with a top quality championship golf course and other country club facilities to be the center of the plan.

In Northwest Arkansas he found fertile ground for his latest grand scheme. In the view of this probably somewhat biased writer of this opinion, Northwest Arkansas is an area that was blessed not only with beautiful Ozark mountain countryside, but also progressive and aggressive people with an outstanding work ethic. It is this area of the country where, among other things, the nation's top poultry producer and one of its top food companies had its genesis and is located, and where Sam Walton started, barely 30 years ago, what has become the nation's top retailer and second largest private employer. There are numerous other successful businesses in this area, and all of these, quite naturally, have created a strong economy which, also naturally, resulted in a substantial number of people becoming wealthy.

Thus, a great number of wealthy Northwest Arkansas citizens welcomed Mr. Berckefeldt's plan to build an exclusive and prestigious development where they could not only "play," but also build and reside in homes not only worthy of, but also signifying their station in and accomplishments in life.

Fred Berckefeldt, in the early stages of the plan, announced that he would accept a limited number of charter members at a reduced fee. These were quickly "snapped up" by a substantial number of well-to-do Northwest Arkansas citizens, and Fred Berckefeldt's latest dream was well on its way.

To his credit, Mr. Berckefeldt's dream or scheme (depending on whether the one assessing it was one who benefitted from it or was harmed by it, such as numerous providers of services and things who remain, to this day, unpaid), resulted in an outstanding development being conceived and carried toward completion. By the Spring of 1992, a beautiful golf course and related facilities were either completed or nearing completion, and numerous building lots had been sold and expensive homes constructed on many of them. By that time, "Champions" had become the "in thing" for people of means, of which there were many.

At the time of the trial, the development had an outstanding 18 hole golf course, and other lavish facilities, including a 54,000 square foot club house, and tennis courts and swimming pools.

In the summer of 1990 it hosted and promoted a golfing event sponsored by Reebok called the "Greg Norman Challenge at Champions Golf and Country Club." According to promotional literature introduced at the trial, the event was nationally televised by CBS and was attended, not only by Greg Norman, but other golfing and sport luminaries such as Larry Bird, Ivan Lendl, Wayne Gretzky, Bruce Lietzke, Miller Barber, and Orville Moody. Under "Added Excitement," prospective attendees were advised that: "This provides spectators another opportunity to enjoy tournament golf. In all, this two-day golf event features a total of 45 captivating holes of tournament golf with some of the greatest names in professional sports."

In addition to the facilities described above, the development consists of approximately 300 homesites with each lot selling for well in excess of $40,000. At the time of the trial there were approximately 100 homes completed at a cost of from several hundred thousand dollars to well in excess of one million dollars, and another 25 to 30 homes under construction. One of these homes was to soon be featured in *Architectural Digest* magazine.

In the Spring of 1992 members of the club and owners of the property described above who had made substantial investments in the club realized that it was about to "go broke." There were numerous rumors and news media stories in respect to the difficulties of the club, and many suppliers of labor, materials, and other services had not been timely paid. Numerous lawsuits ensued, including a highly publicized foreclosure filed by one of the early members and property owners who had personally loaned a large sum of money to Berckefeldt, seeking to foreclose a mortgage on club property and club facilities.

A group of prominent citizens who were also club members and property owners banded together and, in the words of one of them, Colin Washburn, who testified at the trial, Fred Berckefeldt was "run out." At the time that Berckefeldt was, again in his words, "kicked out" a group of 21 investors contributed or invested sums ranging from $100,000 to $1,250,000, raising a total in excess of $6,000,000 to get Berckefeldt out of the picture and to save the club from bankruptcy. About $6,300,000 was raised and the group assumed another $3,800,000 in debt and voluntarily assumed about $1,000,000 of accounts payable owed to local suppliers, contractors, and the like. Apparently suppliers who were not lucky enough to be from the area were left at the mercy of Fred Berckefeldt's ability or inability to pay them.

The total investment of the new group was approximately $10,000,000 and the development and club were saved. This group completed the banishment of Berckefeldt from the scene when certain legal papers were executed around October 1, 1992, transferring ownership of common facilities and unsold lots and other property from Berckefeldt and his legal entities to new legal entities formed by the takeover group. Among other assets transferred was the "Champions" name, although Colin Washburn, one of the organizers of the takeover group, admit-

ted during his testimony that he, and presumably others, knew that the club's right to the use of the name had been challenged in a Houston, Texas, federal court.

At the time of the trial, this Champions had total membership of approximately 675, including three members residing in Texas, but none in the Houston area. The cost of membership was, at the time of the trial, $20,000, and members paid monthly fees of $350.00. This Champions also offers other types of membership at a lesser price for less privileges and less use of the facilities.

Mr. Washburn testified that the new group had no intention to compete for national golf tournaments, did no advertising, and had no plans to franchise the operation or otherwise add additional satellite facilities.

### Discussion and Ruling

In order to decide this case, the court must ask and answer two rather simple questions requiring complex and difficult answers. Those questions are: (1) Was the real Champions harmed?; and, (2) If so, can the law do anything about it?

### 1) Was the Real Champions Harmed?

This court does not believe that there is much doubt about the answer to the first question. Of course, a proliferation of golf courses or golf clubs with the name "Champions" harms the real Champions founded by Jackie Burke and Jimmy Demaret well over 30 years ago. It appears that, since Fred Berckefeldt appropriated the Champions name for his Northwest Arkansas promotion, there has been a proliferation of other clubs with that name. Certain depositions taken for evidentiary purposes were also taken for cases apparently pending in federal district courts in Lexington, Kentucky, and Jacksonville, Florida. There was evidence that there also may be clubs that have taken the Champions name in Georgia and Nebraska.

It defies logic to say that the real Champions is not harmed by the spread of imposters like wildfire across the country. As Mr. Burke said during his testimony, there was only one Champions for 30 years and now there are many. That has to hurt and damage the plaintiff. Using an analogy, undoubtedly the name "Dallas Cowboys" for the Super Bowl Champion professional football team has tremendous value. It would unquestionably have less value if professional teams across the country began to also call themselves the Dallas Cowboys of Northwest Arkansas, the Dallas Cowboys of Jacksonville, Florida, the Dallas Cowboys of Lexington, Kentucky, *ad infinitum*. There is only one Dallas Cowboys football team and a proliferation of football teams with that name would make the name less valuable to identify an outstanding world champion professional squad.

Unfortunately, for whatever reason, Mr. Berckefeldt was not called as a witness at the trial by either side, so the court has no evidence from which it can determine what Mr. Berckefeldt's purpose was in appropriating the Champions name.[5] Neither was Bruce Lietzke, who at least permitted his name to be used in the Northwest Arkansas promotion, called as a witness. However, the evidence does indicate that Bruce Lietzke attended college at the University of Houston and that his college team used Champions to practice and play matches. Additionally, Mr. Lietzke, according to the evidence, worked as a young man at the United States Open tournament held at Champions in 1969. Thus, it is evident that at least he, and undoubtedly Fred Berckefeldt, knew about the history and prestige of Champions of Houston when the Northwest Arkansas development began and its name was chosen.

The writer of this opinion must admit that golf is not "his thing," and while he does not

---

5. There were letters introduced at the trial from Berckefeldt and a local politician to state highway authorities about the placing of highway signs on U.S. Highway 71 directing motorists to Champions. Apparently, the authorities were demanding that certain signs placed without permission be removed. It appears that, since then, highway signs have been installed showing that the name of Horsebarn Road leading from U.S. 71 to the club has been changed to "Champions Drive," also the name of the street upon which Champions of Houston is located. It might be said that, not only did the developers of the Northwest Arkansas project take the Houston club's name, they also took its address.

condemn others for being "golf nuts," frankly does not understand the mentality of avid golfers and the mystique that golf courses seem to hold for many of them. In spite of that, the court recognizes that there are numerous people in this world who not only play golf regularly near their homes, but journey or dream of journeying to famous golf courses around the world to challenge those courses.

The court recognizes that many people not only know the name and location of numerous famous golf courses, but can also literally describe almost every hole on them. The court has noted that most bookstores have books that can be purchased which describe famous golf courses around the world, and contain photographs of excellent quality. Presumably, people buy these books, pore over them and dream of playing, for example, Augusta, St. Andrews, Oakmont, Pebble Beach, and the like.

Thus, the court recognizes, and the evidence in this case showed, that the name Champions for the golf course in Houston developed by Jackie Burke and Jimmy Demaret mean something in the world of golf and among avid golfers, both amateur and professional. The mere fact that there is now another Champions in Northwest Arkansas, and apparently several more around the country, dictates that that name and that golf course have been harmed and that the name is worth less than it was before the proliferation of golf courses using that name.

In this respect, Mr. Burke testified substantially as follows:[6]

> Jimmy Demaret and I sought to create in Champions something that no one else had done and that no one else was doing. I am going to win it back for players who have won championships at our town. I am not going to have to have them explain where they won a golf tournament. They don't have to do it at Augusta, or Oakmont, but all of a sudden now at our club its necessary. I'm going to see that this doesn't have to affect those people. It is what's

right and what's wrong. This club can't be unique with the same name as other clubs.

Mr. Burke also pointed out, as the court has already indicated it recognized, golfers understand and appreciate the mystique and personality of unique golf courses. For example, he said that golfers don't just play St. Andrews, they seek to "beat the course."

In this regard, Jack Valenti testified at the trial by video tape deposition. When asked whether it was his opinion that the use of the name Champions by another golf course in another location would cause public confusion, after an objection, he responded:

> I spent my entire life in two of life's classic fascinations which deal almost solely with how the public reacts. So I suppose if you want to label me as an expert, since I've spent my entire life in that field, I guess I claim some modest expertise. . . . In my opinion, absolutely. Any more than more two movies have the same title, or there were two Pebble Beaches, or three Augusta Nationals, yes, I think it would cause confusion in the minds of people. That is quite obvious.

He was then asked if he had an opinion as to whether that confusion would cause damage to Champions. He replied:

> Well, again, in my judgment I think it certainly wouldn't help Champions. I think it would cause confusion and I don't think that would be salutary to Champions Golf Club at all.

Then, on cross-examination by defendants' attorney who had contended during the trial that Champions of Houston was not what it once was, and after he pointed out that certain golf magazines did not rank the course in the top 100 in the United States, Mr. Valenti replied:

> I think quality is in the eyes of the beholder. I think quality means ambiance, or what people who play golf courses think quality is. But it also has to do with fame and background. If I were going to play a course that Sammy Sneed designed, I may find that more exciting than playing some

---

**6.** No transcript of the trial testimony has yet been prepared, so the following is developed from the court's notes and from listening to a tape recording of the trial testimony. The court believes it to be accurate, but not necessarily verbatim.

fine golf course that Robert French Jones designed. The answer is quality is what people believe that it is.

He was then asked by plaintiff's attorney, "Over your career, does the name Champions Golf Club have any special meaning to you?" He replied:

Yes, I think to golfers too, Champions Golf Club means Demaret and Burke. It's like Nicholas and Sneed, like Falwell and Price, or Norman. Champions Golf Club arises and flourishes out of the genes and the blood memories of Jackie Burke and Jimmy Demaret. So it has a unique status, at least to my mind it does.

Plaintiff's lawyer then asked him: "Throughout the world, does it have recognition? When you go somewhere to play golf or go somewhere to visit and you mention Champions Golf Club, is there an instant recognition to that as to what it is and where it is?" Mr. Valenti's response was:

I'd say many times. I don't keep a log of this. But many times I'm playing at some public golf club in some other part of the country or the world and I start talking about my background, that I came from Houston, and many, many times a golfer will say, Oh, Champions, Jackie Burke, Jimmy Demaret. So I find that there is a high degree of recognition, at least from my standpoint and given my Texas roots, my birth, my goal of life until the age of 40 living in Houston.

When asked, "what does that name call up to you, Champions," he responded:

It means excitement. You enjoy playing a course. I replayed Champions about, I don't know, two years ago, three years ago. I was in Houston. Jackie was out of town, but I went out and played 18 holes. It nourished great memories of the course. I had a great time. I thought it was wonderful. I enjoyed it, and it was better than I had remembered it.

When asked whether he thought the use of the name by others was "demeaning the name of Champions," he said:

As I said earlier, coming out of the movie business, I think names are of overwhelming importance. They are the way you distinguish yourself from someone else. Its called a brand name. That's why brand names are important to manufacturers and marketers. Certainly its so in the movie business, politics. If you had four Bill Clintons running, it would cause a lot of confusion.

He was then asked whether he believed the plagiarization of the name by others would tend to decrease the value of the name and he said:

As I've said, I've spent a lifetime in advertising, public relations, politics, and the movies, and in those arenas, public perception is of absolutely indispensable value and names, or what people believe about a name, or what it evokes for them, is of such towering importance that it goes to the very heart of trying to persuade people to your point of view. The answer is yes. I think its absolutely essential.

Then, during cross examination by defendants' lawyer, Mr. Valenti explained the feeling that avid golfers get when they play famous golf courses as follows:

I think so, but its the difference of saying let's go play at Pine Valley or Pebble Beach or let's go play at the Mirage Hotel or the LaQuinta Hotel. They've got four or five golf courses there. We'll play one of them. I think there's a big distinction about golf courses to a golfer. Like people they have an ambiance, an enticement, a beckoning, depending on its historic value, what it means to the golfing world, so I can tell you that I'm excited about playing Pine Valley, whereas going to the Locust Avenue Golf course—both of them are golf courses—it doesn't fill me with the same kind of excitement. If I'm going to Champions Golf Course it evokes within a golfer memories, hopes, all sorts of miracles. It does things to golfers to play at historic, famous, one-of-a-kind golf courses. At least it does to me. I'm speaking as an addicted golfer now.

Mr. Valenti's description of the emotions that are evoked in avid golfers by playing famous golf courses was echoed by professional golfer Peter Jacobsen who testified by deposition. He is a touring professional with

four tournament wins on the P.G.A. tour, and a player-director on the PGA Tour Policy Board for two terms. He said that he believed Champions to be one of the top ten golf courses in the world, and, when asked about the importance of the name given to such golf courses, he said:

> Each golf course should remain different and distinct in their design and in their manner in which they are thought of; and I think that directly relates to the name of the golf course.... Well, I've played Champions golf course many times. I competed in the tour championship that was held there a few years ago; and I think it is one of the best designed golf courses I've ever played; and it has a—it has an aura and a tradition there with Mr. Burke and the late Mr. Demaret that is hard to find in golf courses around the country these days.

In addition, Earl Elliott testified by deposition that he was a member of Champions of Houston and was a member of the Sectional Affairs Committee of the United States Golf Association and had been for 22 or 23 years. He was the past president of the Houston Golf Association, and was Chairman of the United States Open in 1959 and the United States Amateur in 1993, as well as the Nabisco Championship in 1990.

In describing his job with the United States Golf Association, he testified that he was the person responsible for conducting the local qualifying for the United States Open, the Senior Open, the United States Amateur, and other tournaments. When asked the importance of name recognition to golfers he responded:

> My feeling is that if a golf course has a— such as Baltusrol, which hosted the National Amateur—I mean, the National Open this year in 1993 where Lee Janzen won, everybody in the country knows about Baltusrol, that it's hosted a number of U.S.G.A. events, and particularly seven United States Opens.
>
> Name recognition to me is extremely important, and I would—I don't know of another Baltusrol in the United States. I think that it's very important that a champion of an United States Open or of any

other national championship have an association with the name of the club that he won that championship and that it not be confused by anybody else as being at some other—some other location.

In addition to the evidence about the effect that multiple golf courses called "Champions" has on golfers, there was evidence that the general public was also confused. Mr. Burke testified about an incident in which his wife went to play golf at another club. When she was asked the name of her home golf club and she replied, she was then asked, "How many more of these are they going to build?" He said that other members, when they go to play elsewhere and advise that they are from Champions, are frequently asked, "which Champions?"

There was evidence that, on at least a couple of occasions, a manufacturer of golf balls had mistakenly sent golf balls logoed for and intended for Champions of Northwest Arkansas to Champions of Houston. Additionally, apparently on more than one occasion, golfers who played at other golf courses on a reciprocal basis had the wrong Champions club billed. One of such examples is plaintiff's Exhibit 33 which is a letter from the Dallas Athletic Club apologizing for such a mix up. The writer of the letter, significantly, said:

> With common named clubs, such as yours, our staff automatically assumes the Houston area club and the trouble begins.

Another example is a letter that was introduced at the trial from a young man who had applied for an assistant manager's position at the Arkansas club. In June of 1990 he wrote the club manager at Champions of Arkansas asking that his application be withdrawn but addressed the letter to the Houston club and it was delivered there.

■ For these reasons, the court believes that the answer to the first question that the court posed, "Has the real Champions been harmed?" is clearly "yes." It is also obvious from the answers that the jury gave to the interrogatories posed by the court that the jury also answered that question "yes" even though it chose not to award damages to plaintiff. As the record will reflect, the court

pointed out during the trial that there was little, if any, evidence upon which the jury could base a damage award since damage evidence was speculative at best. The jury apparently intelligently agreed and awarded no damages, even though it found that the name "Champions" had acquired a secondary meaning in the marketplace and that there was both a likelihood of confusion and actual confusion caused by the use of the name by others.

### 2) Can the Law Do Anything About It?

The second question asked by the court: "Can the law do anything about it?", is much more complex and difficult. That is because the law of trademarks, trade names, and service marks did not seem to be designed to, and has not developed in such a manner to provide a clear cut answer to the question posed.

The usual case of infringement is one in which the question is whether a consumer is confused or is likely to become confused when he or she buys or is making the decision to buy a product or service identified with a trademark, trade name, or service mark.

The question of infringement is relatively easy when, for example, there are two rolls of toilet paper on a grocer's shelf, both marked with a similar mark. If the marks are similar enough and result in unfair competition, or one of the marks is protected by statutory law or common law, the law knows what to do about it.

The problem arises in this case because no one, including Mr. Burke who gave candid testimony at the trial on this issue, believes that a golfer who is prepared to spend $15,000 to $20,000 to buy a golf membership might inadvertently purchase a golf membership at a golf club in Houston when he intended to buy one in Northwest Arkansas or vice versa.

Defendants moved for judgment as a matter of law under the provisions of Rule 50 of the Federal Rules of Civil Procedure. In

support, defendants cite *Taj Mahal Enterprises, Ltd. v. Trump,* 745 F.Supp. 240 (D.N.J.1990) an excellent opinion written by Chief Judge Gerry. Defendants contend that the court should consider the ten factors set forth in that opinion [7] and determine that, since the two clubs did not compete, there was no Lanham Act protection or other protection provided by law. In this respect, defendants' attorney contends that:

> A senior user is entitled to exclusive use only when usage occurs within the same markets or would occur within markets into which the senior user could reasonably be expected to expand. Champions of Arkansas does what it does within the confines of its borders in Rogers, Arkansas, attracting its 'consumers' only from a small trade area of some 30 miles in 'Northwest Arkansas.' Champions of Houston does what it does within the confines of its boundaries northwest of Houston, Texas.

While all of that appears, at least on the surface to be true, it does not tell the whole story. The court simply does not believe that, only six years before the 21st Century, the law is so formalized and strait-jacketed that it cannot provide a remedy where there is a wrong as the court believes there obviously is in this case.

The court has concluded that, for the reasons discussed below, a remedy can be provided even under the rather stale provisions of trademark, trade name, and service mark law as it presently exists.

### a) Likelihood of Confusion

As already indicated, the jury was asked whether there was actual confusion and a likelihood of confusion between the golfing services offered by the parties because of the use of the name "Champions" by the Northwest Arkansas development, and the jury's answer in each case was an unequivocal "Yes." However, the first question that must be answered is what effect the jury's verdict in this respect has on the question of whether the court should take action to en-

---

7. In instructing the jury on the law relative to the likelihood of confusion issue, the court apprised the jury of these ten factors and instructed that the jury might consider some or all of them in reaching a conclusion in respect to that matter.

join the use of the name by the Northwest Arkansas group.

■ This court is not the first court that has been faced with that issue or similar issues. Over 30 years ago, Judge J. Smith Henley, for many years and now an outstanding judge on the United States Court of Appeals for this circuit, and then a district Judge in Arkansas, held in respect to a similar issue, that whether a name, mark, or symbol has acquired a secondary meaning "is a mixed question of law and fact with the factual aspects predominating." *Liberty Mutual Ins. Co. v. Liberty Ins. Co.* 185 F.Supp. 895, 903 (E.D.Ark.1960).

An article in Rudolf Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* § 20.08 (L. Altman ed., 4th ed. 1993), discusses this issue and says:

> There is a conflict of authority over the issue of whether, in a jury trial, likelihood of confusion is a question of fact for the jury, or a question of law which lies within the exclusive judgment of the trial judge. In a bench trial, of course, that question does not arise. But in either type of case it can arise on appeal, because of the rule that fact determinations are reversible only if clearly erroneous, while questions of law are reviewable de novo by the appellate court.

*Id.* at 35–36 (footnotes omitted). Then at § 20.64 Callman's concludes:

> The federal courts, however, are in hopeless disagreement on whether likelihood of confusion is a question of fact or law for purposes of appeal.

*Id.* at 561 (footnote omitted).

There then is an attempt to collect the authorities on this issue from the various jurisdictions. When the Eighth Circuit cases collected in that article and disclosed through independent research are considered, it appears that Callman's conclusion that there is "hopeless disagreement" among the federal courts on this issue also applies to the decisions of the Court of Appeals for this circuit. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.,* 815 F.2d 500 (8th Cir. 1987) and *Electronic Communications, Inc. v. Electronic Components for Industry Co.,*

443 F.2d 487 (8th Cir.1971), *cert. denied,* 404 U.S. 833, 92 S.Ct. 80, 30 L.Ed.2d 63 (1971) appear to be holdings in which the particular panels deciding those cases held or indicated that that issue was one of law and, thus, the Court of Appeals would consider the issue *de novo.* Contrarily, in *SquirtCo v. Seven–Up Co.,* 628 F.2d 1086 (8th Cir.1980), the panel deciding that case seems to have decided that the question of likelihood of confusion is a fact question and the trial court's findings in this respect should be reversed only where clearly erroneous.

The 8th Circuit cases holding that the likelihood of confusion issue is a question of law were decided before the 1985 amendments to Federal Rule of Civil Procedure 52(a) and before the Supreme Court's decision in *Anderson v. City of Bessemer,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). For a discussion of how that Supreme Court decision may affect this issue, *see Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423 (7th Cir.1985).

■ Thus, this court concludes that the better rule, and the rule that would now be applied in this circuit, is that set forth in *American Home Products Corp. v. Barr Laboratories, Inc.,* 834 F.2d 368 (3d Cir. 1987). This court is, therefore, bound by the finding of the jury that there was a likelihood of confusion in this case unless such finding is "totally unsupported by the record." *Lewis v. Harrison School Dist. No. 1,* 805 F.2d 310, 315 (8th Cir.1986), *cert. denied,* 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987). In any event, even if this court was not bound to follow the jury's verdict in this respect, it would conclude as the jury did, for the reasons set forth above.

Having so concluded, the court must now determine whether, in spite of the finding that there is a likelihood of confusion in this case, because of the nature of and location of the businesses operated by the parties, plaintiff is unprotected by the law, as defendants argue.

The record reflects that, for approximately 30 years, Champions of Houston enjoyed the exclusive use of its name and developed it into a mark that means something in the

golfing world. It appears that at the time the club was formed, all that the founders did to attempt to protect that name was register it in 1957 in the State of Texas as an assumed name. Then, in 1978 it was registered in the State of Texas as a trademark.

It was not until the late 1980's that the officials of the club learned that others were using or threatening to use the Champions name, so in March of 1990 the name was registered as a service mark in the United States Patent and Trademark Office. The effect of this is that:

> Registration of a trademark by the Office therefore gives rise to a rebuttable statutory presumption of ownership of the mark and validity of the registration. More specifically, under Section 7(b) of the Lanham Act, a certificate of registration on the principal register is prima facie evidence of the validity of the registration, of the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce on the goods or services specified therein, subject to whatever conditions or limitations may be contained in the certificate.

4A Callman, *supra*, § 25.05 at 37 (footnotes omitted).

In spite of this, it is the position of defendants that, in effect, there is nothing that the law can do about what has occurred because of the peculiar nature of the businesses in which the parties are engaged and because of their geographical separation. Defendants contend that there is no competition between the parties and that the Lanham Act only covers situations where the parties have competing goods. In other words, since there is no evidence from which a reasonable person could conclude that someone is likely to become confused and join Champions of Northwest Arkansas when they intended to join Champions of Houston, or vice versa, what has happened to the real Champions in this case is not protected by the law.

Although that argument certainly sounds powerful, at least at first blush, after careful consideration the court has concluded that the defendants in this case cannot, under the law, be permitted to kidnap and use for their own purposes the valuable name and being created by Jackie Burke and Jimmy Demaret and nurtured and developed by them and those who followed them over a period in excess of 30 years.

In the first place, it is not at all clear that there is, in fact, no competition between the parties to this case. As already indicated, the court believes that the evidence indicates that competition in the golfing world is something different than that where other commercial products such as toothpaste, soap, toilet paper, and the like are sold. Avid and fanatical golfers travel around the world playing clubs that have gained a reputation such as that of Champions of Houston. In fact, Champions realizes almost $600,000 per year in revenue from fees paid by non-members.

While the desires of Champions of Northwest Arkansas, as expressed by Colin Washburn, may have changed when the present owners "ran off" Fred Berckefeldt, it is not at all clear that the views they now espouse in respect to their intention for the Northwest Arkansas club were always true and there is no certainty that it will always be true in the future.

There certainly was a time in which Fred Berckefeldt attempted to make the Northwest Arkansas club well-known around the country. That is evidenced by national advertising utilized by Berckefeldt, and the promotion of nationally televised golf tournaments such as the one sponsored by Reebok described above. There is little question but that Fred Berckefeldt intended to and set about to make this golf club well-known to avid golfers in the hopes that both major tournaments and golfers would travel to the course to experience the kinds of things that Jack Valenti described avid golfers experience when they play noted courses.

█ There was then competition between Champions of Houston and Champions of Northwest Arkansas, and there is no assurance that there will not be such competition in the future. Thus, the court believes that, even using traditional standards, § 32 of the Lanham Act, 15 U.S.C. § 1114, and § 43 of that Act, 15 U.S.C. § 1125, protects the interest of the plaintiff in this case and permits

the court to take action to preserve the rights acquired through over 30 years of exclusive use of the name "Champions".

Callman, in his excellent work cited above, recognizes that trademark law has not consistently and forthrightly developed so as to provide clearcut answers to the questions that are often raised in today's business environment, such as those that are present in this case. However, at § 20.01 of his work, he says:

> Even prior to the Lanham Act, two basic types of trade identity confusion were recognized by the courts: confusion of source, and confusion of sponsorship. The Lanham Act then gave statutory recognition to the concept that confusion is not limited to situations in which the marks are "appropriated to merchandise of the same descriptive properties" or "affixed to merchandise of substantially the same descriptive properties." Absent this limitation, any kind of confusion, mistake or deception of the public arising out of the use of a trademark may give rise to a cause of action, and the Lanham Act's broader conceptual approach to confusion has rendered many decisions under the 1905 Act valueless as precedent. A likelihood of confusion attributable to the use of a similar trademark need no longer be predicated upon the claim that the public may be misled because there is a similarity between the litigants goods or their businesses. We now have a statutory basis for dealing with trade identify confusion that arises out of another's use of a similar mark in connection with a product or business wholly unrelated, or even alien, to that of the trademark owner.

3A Callman, *supra,* § 20.01 at 3–4 (footnotes omitted).

At § 20.03 of this work, Callman discusses what has become known as "confusion of sponsorship" and cites numerous cases.[8] in which senior users of a trade name or service mark have been protected by the courts through application of the relevant provisions of the Lanham Act. 3A Callman, *supra,* § 20.03. At § 20.04 of this article the author

points out, in words that almost seem to have been written for this case:

> In cases where the products are not in direct competition with each other, there is no diversion of trade; purchasers will not mistakenly buy woolen piece goods when they are shopping for a suit. But even in such cases, the plaintiff loses control over his trade reputation. Though the defendant may presently be making a fine product, the plaintiff has no assurance that the defendant will always continue to do so; control over the plaintiff's reputation is in the defendant's hands.

3A Callman, *supra,* § 20.04 at 18 (footnotes omitted).

■ For the reasons already stated, this court is convinced that the simple fact that defendants and apparently others across the country are using and thereby harming Champions valuable name, and because such use, according to the evidence, may imply and may cause others to believe that the imposters are in some way connected with the real Champions, there exists a confusion of sponsorship which the cited provisions of the Lanham Act protect.

If this proliferation of Champion Golf Clubs across the country, apparently starting with Champions of Northwest Arkansas, is allowed to continue, there is little question but that the meaning of the name Champions as shown by the evidence in this case, and the emotions and memories that it evokes, will become tarnished and diluted beyond recognition. The name is now valuable to the Houston club, but unless the courts are able to fashion a remedy for the wrongs that have been committed, it will be worth nothing. Thus, plaintiff is irreparably harmed by the continued use by the Northwest Arkansas group of the name Champions, and such actions will be enjoined.

### b) *Protection of Property Right*

In *Pullan v. Fulbright,* 287 Ark. 21, 695 S.W.2d 830 (1985), the Arkansas Supreme Court held that "[d]escriptive words may not be afforded the status of a trade name unless

---

8. This court deems it unnecessary to cite these cases. Anyone interested in obtaining the citations may do so by referring to the Callman article cited above and below.

they have acquired a 'secondary meaning.'" *Id.*, 287 Ark. at 23, 695 S.W.2d 830. The court then, in explaining what "secondary meaning" meant, quoted with approval from *Liberty Mutual Ins. Co. v. Liberty Ins., supra*, in pertinent part as follows:

> There are certain names, marks, and symbols which in their primary sense are merely generic or descriptive and do not ordinarily indicate the origin of goods or services. Such names, marks, or symbols, when used in their primary sense, cannot form the subject matter of a trade or service mark. However, a name, mark, or symbol by long and exclusive use in advertising by one person in the sale of his goods and services may become so associated in the public mind with such goods or services that it serves to identify them and distinguish them from the goods or services of others. When such an association exists, the name, mark, or symbol is said to have acquired a "secondary meaning" in which the original user has a property right which equity will protect against unfair appropriation by a competitor.

*Liberty Mutual*, 185 F.Supp. at 903.

It was because of that aspect of the law and because of the provisions of Ark.Code Ann. § 4–71–113 (Repl.1991) discussed below, that this court instructed the jury on the issue of "secondary meaning" and asked the jury to determine whether the name "Champions" had acquired a secondary meaning as defined by the court's instruction. As already indicated, the jury answered "yes."

■ For the reasons already stated, the court believes that, at the very least, that question is a mixed question of law or fact "with the factual aspects predominating." *Liberty Mutual*, 185 F.Supp. at 903; *Beneficial Loan Corp. v. Personal Loan & Finance Corp.*, 100 F.Supp. 838, 845 (E.D.Ark.1951). Thus, as already discussed, this court believes that it is bound to apply the jury's verdict in this respect, but even if it is not, it would conclude as the jury did.

■ Thus, the plaintiff has a valuable property right in its name. Section 25.03 of Callman, points out that the right to a trademark or trade name does not depend upon the statutory enactments. 4A Callman, *supra*, § 25.03. Instead, the right originates in common law by prior appropriation and use. *Id.*

■ Since this is true, even absent the provisions of the Lanham Act, plaintiff is entitled to an injunction in this case to protect its valuable property right and to terminate or prevent irreparable harm to that right. Again, as was pointed out in *Pullan, supra*, in quoting with approval from *Liberty Mutual, supra*, when a name, mark or symbol has acquired a "secondary meaning," the original user has a "property right which equity will protect against unfair appropriation by a competitor." *Pullan*, 287 Ark. at 24, 695 S.W.2d 830.

### c) *Dilution*

Even if it is assumed, as defendants argue, that there is no trademark infringement under the Lanham Act because the parties to this lawsuit do not compete as to the services that each provides or that their businesses are so completely unrelated that there is no likelihood or prospect of either confusion of source or sponsorship, that still does not mean that the actions of the defendants in this case have not harmed plaintiff's name. That is true because the use of the name by defendants and others has diluted the distinctiveness of the plaintiff's mark. Dilution is explained by Callman, at § 21.11 as:

> The gravamen of a dilution complaint is that the continuing use of a mark similar to the plaintiffs will inexorably have an adverse affect upon the value of the plaintiff's mark, and that, if he is powerless to prevent such use, the plaintiff's mark will eventually be deprived of all distinctiveness.
>
>   *   *   *   *   *   *
>
> Dilution ... is a cancer which, if allowed to spread, will *slowly* destroy the advertising value of the mark. Accordingly it has been held that dilution is sufficient irreparable harm to justify the granting of a preliminary injunction.

3A Callman, *supra*, § 21.11 at 67 (footnotes omitted) (emphasis in original).

Subsequently in this work, Callman, at § 21.11, recognizes that there is no express dilution provision in the Lanham Act, although it is obvious from the discussion that he believes that there should be. *Id.* at 71. He also recognizes that it has been said that: "The doctrine [of dilution] has not been adopted by the federal courts." *Id.* (footnote omitted). Callman then goes on to say that: "[i]f this be true, perhaps it is time." *Id.* (footnote omitted).

■ The fact is, as this work admits, there are no provisions of the Lanham Act under which a dilution theory can be approached. There was specific rejection by Congress of an amendment which would have included an anti-dilution provision. *Id.* at 72. The fact is, as Callman recognizes, in view of that rejection, there has been very little room left for a court to provide anti-dilution protection under the cloak of the Lanham Act.

■ However, in this court's view, that does not preclude it from exercising its inherent powers as a court of equity to right this wrong by enjoining the further dilution of plaintiff's good name by these defendants. For other cases so holding, *see, Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153 (7th Cir.1984), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984); *American Exp. Co. v. Vibra Approved Laboratories Corp.,* 10 U.S.P.Q.2d (BNA) 2006, 1989 WL 39679, (S.D.N.Y.1989); *Steinway & Sons v. Demars & Friends,* 210 U.S.P.Q. 954, 1981 WL 40530 (C.D.Cal.1981); *Or Da Ind., Ltd. v. Leisure Learning Products, Inc.,* 479 F.Supp. 710 (S.D.N.Y.1979).

For the reasons already stated, the court believes and finds that the wrongful use of the name by the Arkansas development and the proliferation of Champions Golf clubs initiated by the wrongful use of the name by the Northwest Arkansas group has begun to eat away at and dilute and weaken the value of plaintiff's name. That is irreparable harm which this court has the power and the duty,

using its equity powers, to prevent and terminate.

■ Even if the court did not have such inherent power, it believes that the provisions of Ark.Code Ann. § 4–71–113 (Repl. 1991) gives it such power. That provision of Arkansas law says:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be grounds for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to source of goods or services.

*Id.*

As already discussed, the jury found, and the court even absent such jury finding would conclude, that defendants have a common law right to the use of the name Champions exclusive of all others because such name has acquired a secondary meaning.[9] Thus, Arkansas' anti-dilution statute empowers this court, sitting in Fayetteville, Arkansas, to enjoin the defendants whose golf club is located nearby, from continuing to dilute and inexorably destroy plaintiff's good name.

Defendants in their brief filed in this case conclude, without citing a single case or other authority for it, that:

> Arkansas and Texas both have dilution statutes. But it is elementary that because plaintiff operates only in Texas and defendants operate only in Arkansas the legal effect of Texas dilution laws end at the Texas border and cannot affect acts taking place in Arkansas and the legal effects of Arkansas dilution laws end at the border of Arkansas and cannot affect acts taking place in Texas. Therefore, dilution concepts can only support the jury verdict if there exists a federal anti-dilution law, and none does exist.

Respectfully, the court does not believe that that argument "makes sense" and sus-

9. It is recognized that the Arkansas Supreme Court, in apparently the only case brought under this statute, *Pullan v. Fulbright, supra,* concluded that the words "shear pleasure" were descriptive and not distinctive. However, that opinion also points out that there was no evidence from which it could be found that a single person thought of appellee's beauty shop when those words were used. In our case, there was such evidence.

pects that the reason that no authority was cited for it is because none exists.

It should be remembered that Champions of Houston was in this court in Arkansas only because defendants, as they had a right to do, insisted that they not be sued in Texas. Plaintiff was then required to file the lawsuit here where defendants are located and where the acts complained of were taking place. How can it be said that the Arkansas statute, which was obviously designed to protect parties under the circumstances of this case, does not apply simply because plaintiff is from Texas. That is akin to arguing that a resident of Texas who was injured in an automobile accident in Arkansas because of the negligence of an Arkansas citizen could have neither the rules of the road of Texas or the rules of the road of Arkansas applied to the case which he was required to bring in Arkansas. In the words of Mr. Brummel in Charles Dickens *Oliver Twist:* "If the law supposes that, the law is a ass, a idiot."

■ State anti-dilution laws nearly identical to the Arkansas statute have been held to be enforceable nationwide against defendants over whom a court has jurisdiction. *See Polaroid Corp. v. Polaraid, Inc.,* 319 F.2d 830 (7th Cir.1963); *Eastman Kodak Co. v. Rakow,* 739 F.Supp 116 (W.D.N.Y.1989); *Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323 (N.D.Ill.1981), *aff'd* 694 F.2d 145 (7th Cir.1982); and *Golden Door, Inc. v. Odisho,* 437 F.Supp. 956 (N.D.Cal.1977), *aff'd* 646 F.2d 347 (9th Cir.1980).

Curiously, defendants' counsel also argued in his brief that:

> It should be noted that the Arkansas Act only provides protection to the owner of an act registered in Arkansas and that an Arkansas trademark infringement case must still meet the test required by the Lanham Trademark Act, *i.e.,* that use is likely to cause confusion.

Defendants cite Ark.Code Ann. 4–71–112 and this court's opinion in *Gaston's White River Resort v. Rush,* 701 F.Supp. 1431 (W.D.Ark. 1988).

It is not explained what Ark.Code Ann. § 4–71–112 (Repl.1991) has to do with this lawsuit, and the court does not believe that

its opinion in *Gaston's, supra,* supports the proposition for which it is cited. Nor, is there any basis for contending that the Arkansas anti-dilution statute requires a showing that the mark in question is registered under the Arkansas statute. That is one of the bases for invoking the anti-dilution statute, but clearly not the only one. Also protectable is any mark or trade name, "valid at common law."

## CONCLUSION

For any and all the reasons set forth above, the court will, contemporaneously herewith, enter an order granting the plaintiff's request for an injunction effective 90 days from the date of the order, enjoining and restraining the defendants and their officers, members, agents, servants and employees from using in any way the name "Champions," or any derivation thereof, to operate or promote the development in Northwest Arkansas now known as "Champions Golf and Country Club," or any property connected to or associated therewith.

## FINAL JUDGMENT AND ORDER GRANTING INJUNCTION

On this 11th day of February, 1993, for the reasons set forth in a memorandum opinion filed contemporaneously herewith, the court finds that plaintiff has established that it has, by prior use, acquired certain common law rights and property rights to the service mark "Champions" used in connection with the service of providing golfing and country club services, such mark being registered as United States Trademark Registration No. 1,586,173, and that defendants have used and are continuing to use such marks. The court further finds that the continued use by defendants, or any of them, of plaintiff's service mark in connection with the providing of golfing or country club services is likely to cause confusion and has caused confusion and mistake and has deceived or is likely to deceive or otherwise mislead the trade or public into believing that plaintiff and defendants, or any of them, are one and the same or are somehow connected, or that plaintiff is a sponsor of defendants or that such defendants are in some manner affiliated or associ-

ated with or under the supervision or control of plaintiff, or that the golfing and country club services of defendants originate with plaintiff or are conducted or offered with the approval, consent, or authorization or under the supervision of plaintiff, or are likely to lead the trade public to associate defendants with plaintiff. For these reasons, the court further finds that defendants have infringed plaintiff's rights as more particularly set forth in the memorandum opinion. Additionally, the court finds that the use by defendants of the name "Champions" in connection with their provision of country club and golf services has harmed plaintiff's service mark in that it has been diluted and inexorably diminished in value. The court further finds that such actions by defendants have been in violation of 15 U.S.C. § 1051 *et seq.* and protection provided by the common law, and Ark.Code Ann. § 4–71–113 (Repl.1991), and that under such law, the court is authorized to take action to remedy the wrongs that have been and are being visited upon the plaintiff. Additionally the court, utilizing its inherent power as a court of equity, has the power to take such action.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that defendants, and each of them, and their shareholders, members, agents, servants, employees, and attorneys and their successors and assigns and all other persons in active concert or privity with them are hereby permanently enjoined from using in any way the name "Champions," or any derivation thereof, to operate or promote the development in Northwest Arkansas now known as "Champions Golf and Country Club," or any property connected or associated therewith, and are further enjoined from using said name in connection with the providing, advertising, selling, or promoting, or offering in any way the golfing or country club services of defendants.

The injunction granted herein shall become effective **90 days from the date of this order.**

IT IS SO ORDERED.